Herbert M. COLLINS, Dr. H. Marks S. Richard, Barbara C. Parham, Willam E. Swindell, Jr., Dr. Milton A. Reid, Norfolk Branch, National Association For the Advancement of Colored People, George Banks, and Julian Hazel, Plaintiffs,

v.

CITY OF NORFOLK, VIRGINIA, a municipal corporation; Vincent J. Thomas, Mayor, Dr. Mason C. Andrews, Joseph A. Leafe, Rev. Joseph N. Green, Jr., Claude J. Staylor, Jr., Robert E. Summers, and Mrs. Elizabeth M. Howell, members of the Norfolk City Council; City of Norfolk Electoral Board; Paul D. Fraim, Martha H. Boone, and Paul M. Lipkin, members of the City of Norfolk Electoral Board, Defendants.

Civ. A. No. 83–526–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

July 17, 1984.

James F. Gay, Norfolk, Va., Frank R. Parker, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

Philip R. Trapani, City Atty., Harold P. Juren, Deputy City Atty., Lydia C. Taylor, Asst. City Atty., Norfolk, Va., R. Harvey Chappell, Jr., Paul W. Jacobs, II, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for defendants.

## MEMORANDUM OPINION

CLARKE, District Judge.

This matter is before the Court following a nonjury trial which was held on May 21 to June 5, 1984. After hearing the evidence, the Court directed the parties to submit post-trial briefs addressing the factual and legal issues raised. Post-trial briefs have been received, and therefore the matter is now ripe for decision.

The plaintiffs in this action are seven black residents and registered voters of the City of Norfolk, Virginia and the Norfolk Branch of the National Association for the Advancement of Colored People (NAACP). The defendants are the City of Norfolk, the seven members of the Norfolk City Council who were serving when this action was filed, the Norfolk Electoral Board and the three members of the Electoral Board.

The plaintiffs allege that the at-large system of electing members of the Norfolk City Council unlawfully dilutes black voting strength in violation of Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973. Alternatively, they allege that the at-large system was adopted in 1918 and has been maintained for a racially discriminatory purpose in violation of their Fourteenth and Fifteenth Amendment rights and 42 U.S.C. § 1983.

The plaintiffs seek (1) a declaratory judgment that the at-large system of electing members of the Norfolk City Council unlawfully dilutes black voting strength; (2) an injunction prohibiting the holding of future City Council elections under the at-large system; and (3) the replacement of the at-large system with a plan whereby all seven City Council members would be elected from wards or single-member districts. A motion to certify this action as a class action was denied by Order of February 23, 1984.

## I. APPLICABLE LAW

Two competing legal principles are applicable in this case. The first is that political systems or practices which deny minority voters access to the political system have been repeatedly struck down by the courts. *See, e.g., White v. Regester,* 412 U.S. 755, 765–70, 93 S.Ct. 2332, 2339–41, 37 L.Ed.2d 314 (1973); *Zimmer v. McKeithen,* 485 F.2d 1297, 1304–07 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1003, 47 L.Ed.2d 296 (1976) (per curiam). The second is that courts have consistently rejected the view that any group has a constitutional right to proportional political representation. *See, e.g., Whitcomb v. Chavis,* 403 U.S. 124, 156–57, 91 S.Ct. 1858, 1875–76, 29 L.Ed.2d 363 (1971). These competing legal principles are directly involved in this case.

Section 2 of the Voting Rights Act, as amended in 1982, reads as follows:

SEC. 2. (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a matter *which results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the *totality of circumstances*, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by

members of a class of citizens protected by subsection (a) in that its *members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice*. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: PROVIDED, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (Supp.1984) (emphasis added).

Congress amended Section 2 of the Voting Rights Act to prohibit electoral practices and procedures that create discriminatory results, even though the responsible governmental body had not installed or maintained the electoral practice or procedure in order to discriminate.[1] In amending the Act, Congress in effect overruled *City of Mobile v. Bolden,* 446 U.S. 55, 66–71, 100 S.Ct. 1490, 1499–1501, 64 L.Ed.2d 47 (1980), in which the Supreme Court held that a claim of denial of access to the political process by a minority group requires a showing of purpose to discriminate. Specifically, the *Bolden* Court held that both in an action based upon the Fourteenth and Fifteenth Amendments and in an action based upon Section 2 of the Voting Rights Act, as originally enacted, the plaintiffs were required to show an intent to discriminate. *Id.* at 62–65, 100 S.Ct. at 1497–1498.

■ In amending Section 2, Congress sought to remove the requirement that proof of discriminatory intent was necessary to establish a violation of Section 2. *See* S.Rep. No. 417, 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S.Code Cong. & Ad. News 177, 179; *see Jordan v. City of Greenwood,* 711 F.2d 667, 668–69 (5th Cir. 1983). Congress endeavored to codify the holding in pre-*Bolden* cases, specifically

the holding in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). In *White,* the Supreme Court held that to sustain a claim of vote dilution the plaintiffs' burden is:

to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.

*Id.* at 766, 93 S.Ct. at 2339.

■ To establish a violation of Section 2, plaintiffs may show a variety of factors in an attempt to prove their case. The Senate Committee on the Judiciary included a list of typical factors in its report:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

---

1. The defendants do not challenge the constitutionality of amended Section 2, which has been held to be constitutional by a number of courts.

*See, e.g., Jones v. City of Lubbock,* 727 F.2d 364, 372–75 (5th Cir.1984); *Major v. Treen,* 574 F.Supp. 325, 342–49 (E.D.La.1983).

6. whether political campaigns have been characterized by overt or subtle racial appeals; and

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29, *reprinted in* 1982 U.S.Code Cong. & Ad. News 177, 206–07.

Two additional factors listed in the Senate Report as having probative value are:

1. whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

2. whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.*

The factors listed in the Senate Report are similar to the factors articulated originally in *Zimmer v. McKeithen,* 485 F.2d 1297, 1305 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975) (per curiam). In *Zimmer,* the Fifth Circuit listed four "primary" or "principal" factors which should be considered in a vote dilution case. These factors are:

1. a lack of access to the process of slating candidates;

2. the unresponsiveness of legislators to the minority's particularized interests;

3. a tenuous state policy underlying the preference for multi-member or at-large districting; and

4. the existence of past discrimination which in general precludes effective minority participation in the election system.

*Id.* at 1305. The *Zimmer* court also listed four so-called enhancing factors, which tend to support the findings made relative to the four primary factors. These are:

1. the existence of large districts;

2. the existence of majority vote requirements;

3. the existence of anti-single shot voting provisions; and

4. the lack of provision for at-large candidates running from particular geographical subdistricts.

*Id.* ·

Both the *Zimmer* case and the Senate Report explicitly state that there is no requirement that the plaintiffs prove that all or even a majority of these factors are present. *Zimmer,* 485 F.2d at 1305; S.Rep. No. 417, 97th Cong., 2d Sess. 29, *reprinted in* 1982 U.S.Code Cong. & Ad. News 177, 207. Rather, courts are to consider the existence, or lack of existence, of these factors in the *Zimmer* court's terms in the "aggregate," or as the language of Section 2 states, based upon the "totality of circumstances." It should be pointed out that the Senate Committee specifically stated that it did not intend that the factors be used "as a mechanical 'point counting' device." S.Rep. No. 417, 97th Cong., 2d Sess. 29 n. 118, *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 207.

This Court, therefore, will examine seriatim the factors listed in *Zimmer* and in the Senate Report. The Court will make detailed findings of fact with reference to each factor which the plaintiffs allege is applicable, as required by Rule 52(a) of the Federal Rules of Civil Procedure. The Court is aware of the requirement that it discuss all substantial evidence contrary to its opinion. *See Velasquez v. City of Abilene,* 725 F.2d 1017, 1020–21 (5th Cir.1984). The Court will then weigh the factors and determine whether, "based on the totality of circumstances," the plaintiffs have shown that the political processes leading to the election of the members of the Norfolk City Council "are not equally open to participation" by the black citizens of Norfolk, in that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973 (Supp.1984).

■ Should the Court determine that the plaintiffs have failed to prove a violation of Section 2 of the Voting Rights Act, the

Court will then consider whether the plaintiffs have proven that their Fourteenth and Fifteenth Amendment rights have been violated. *Bolden* remains the law with regard to constitutional violations. *See Chapman v. Nicholson,* 579 F.Supp. 1504, 1507 (N.D. Ala.1984). The Court will determine whether the plaintiffs have shown that the at-large system was adopted and has been maintained with the intent of discriminating against the black citizens of Norfolk.

## II. FINDINGS OF FACT

### A. Introduction

According to the 1980 Census, Norfolk has a total population of 266,979 persons, of whom 60.8%, or 162,300, are white, and 35.2%, or 93,987, are black. The 1980 figures show that Norfolk has a total voting age population of 201,366, of whom 64.85%, or 130,595, are white and 31.48%, or 63,396, are black. Norfolk does not maintain voter registration figures by race.

The City of Norfolk currently is governed by a City Council consisting of seven members who are elected by the voters of the City in at-large elections. The seven members of the Council elect the mayor from amongst themselves. Members serve four-year terms, which are staggered. Three seats were at stake in the most recent election, which was held on May 1, 1984. The next election is scheduled for May, 1986, at which time the four remaining seats will be up for election. Elections are held every two years and always occur in even-numbered years.

At-large City Council elections have been held in Norfolk continuously since 1918, when a new City Charter was adopted. The Charter changed the form of City government to a city manager-council form of government.

Since at-large elections were instituted in 1918, three blacks have been elected to the Norfolk City Council. Joseph A. Jordan, Jr. was first elected to the City Council in 1968, and was reelected in 1972 and 1976. He served as vice mayor during his last two terms. When Jordan resigned from his seat on Council as a result of having been appointed a judge, Reverend Joseph N. Green, Jr. was appointed to fill Jordan's unexpired term. Rev. Green was elected to the City Council in 1978 and again in 1982. He has served as vice mayor since 1982 and was recently reelected to that office. The third black, Reverend John Foster, won a seat on the City Council in the May 1, 1984 election. Accordingly, for the period of July 1, 1984 through June 30, 1986, the seven-member Council will have two black members, Rev. Green and Rev. Foster.

### B. History of the Adoption of the At-Large System

The plaintiffs' historian, Dr. Peyton McCrary, and the defendants' historian, Dr. Peter Stewart, each presented their view of the history which preceded the adoption of at-large elections in Norfolk in 1918. The Court will briefly review that history, much of which is not in dispute.

The City of Norfolk received its Charter from the Crown and was incorporated as a borough in 1736. In 1845, Norfolk was incorporated as a city by the Virginia General Assembly. From 1816 to the present, the City Charters have provided for the at-large election of various municipal officers. The 1845 City Charter provided for a bicameral city council, consisting of the Common Council, which was elected at-large, and the Select Council, which was selected by the Common Council from amongst its own members. In 1873, the City Charter was amended to provide for the election of members of the Common Council from wards. The members of the Common Council continued to appoint the members of the Select Council. The mayor continued to be elected at-large.

In 1882, the Virginia General Assembly adopted a new charter for the City of Norfolk, which provided for the election of the Common Council members from wards and the at-large election of the Select Council. The mayor was still to be elected at-large. Thereafter, control of the General Assembly changed hands, and in 1884 a new

Norfolk Charter was adopted, which was identical to the one adopted in 1873.

As a result of the adoption of the Virginia Constitution in 1902, which provided for a literacy test and a poll tax, most blacks and some whites were effectively disenfranchised. As a result of the imposition of these measures, black voter registration in Norfolk declined from 1,826 in 1900 to 504 in 1902. White voter registration also declined, from 6,732 in 1900 to 4,698 in 1902. The number of registered black voters, according to the State poll tax records for the City of Norfolk, fluctuated during the next fifteen years. The 1911 annexation of Huntersville, a predominantly black area, from Norfolk County resulted in an increase of from 38 to 154 registered black voters in that year. White voter registration also fluctuated during the period.

In 1906, the Virginia General Assembly adopted a new Norfolk Charter, which provided for the election of a Common Council of not less than fourteen nor more than forty members and a Board of Aldermen of not less than eight nor more than thirty members, each to be elected from wards. A three-member Board of Control, with combined legislative and administrative powers, was to be elected at-large. City officers, such as the Commonwealth's attorney, commissioner of revenue and city treasurer were to be elected at-large.

Efforts toward municipal reform were begun in Norfolk in 1913, by members of the Citizens Party, a group whose prime concerns were religion and morality. The black citizens of Norfolk were often associated with the Citizens Party. Members of the Norfolk Chamber of Commerce, which favored the adoption of a city manager form of government, were also aligned with the Citizens Party.

In August, 1915, the issue of whether to create a charter commission to study the adoption of a city manager form of government was submitted to Norfolk's voters. The measure was supported by a majority of those voting, but failed because it was not approved by a majority of all registered voters, as required by State law. The 1915 referendum had the support of the Norfolk Chamber of Commerce and the Citizens Party.

No further efforts for a new charter occurred until 1917, when State law was changed to allow voter approval of a charter change by a majority of the votes cast instead of by a majority of registered voters. In June, 1917, Norfolk's voters approved the establishment of a charter study commission. The Charter Commission issued the proposed charter in September, 1917, which provided for a city manager form of government and the at-large election of a small city council. A referendum on the adoption of the new charter was set for November 20, 1917.

The main dispute between the plaintiffs' and defendants' historians concerns the interpretation to be accorded a series of advertisements which appeared in *The Virginian-Pilot* newspaper in the days before the election. The plaintiffs' expert, Dr. McCrary, conceded that but for the appearance of these advertisements, he "would have found it easier to believe that the race issue did not surface." (Tr. 412). The Court is of the opinion that prior to November, 1917, race was not an issue in the charter change campaign.

The issue of race was first raised by opponents of the charter change on November 9, 1917, according to newspaper accounts. They charged that the new charter would increase the political power of blacks because of the abolition of the white primary. The first advertisement raising the issue of race appeared in *The Virginian-Pilot* on November 13, 1917, seven days before the referendum. In that advertisement, headlined "The New Charter a Danger to White Supremacy," the opponents of the charter change claimed that passage of the charter would result in the qualification to vote of "nearly 2,000 Negro men." (Plaintiffs' Exh. 43). The opponents of the charter change repeated many of the same allegations in a November 16, 1917 advertisement entitled "White Supremacy."

The proponents of the new charter responded to the opponents' allegations in a

November 17, 1917 advertisement headline "Don't Let The Bosses Play Upon Your Sentiments." (Plaintiffs' Exh. 43). In the advertisement, the proponents argued that the issue of white supremacy and the black vote was irrelevant because the state qualifications for voting would remain the same under the 1902 Constitution. They repeated this argument in a November 19, 1917 advertisement.

After reviewing these advertisements, the Court adopts the view of defendants' expert, Dr. Stewart, that the issue of race was first raised by the opponents of the new charter and that the proponents of the new charter attempted to convince the voters that the real issue was efficient local government, not "the colored question." (Plaintiffs' Exh. 43). The charter proponents tried to convince the voters that the charter opponents were trying to distract them from the real issue, that is, whether a city manager form of government would be more effective.

On the date of the referendum, November 20, 1917, the state poll tax records show that approximately 360[2] blacks and approximately 7,910 whites were registered to vote in Norfolk. Based on these figures, blacks constituted just over 4% of the Norfolk electorate. In the most identifiably black precinct in the City, in Huntersville, there were between 100 and 200 blacks qualified to vote in the charter referendum. The voters in that precinct approved the new charter by a vote of 121 to 32.

In 1918, the Virginia General Assembly adopted the new Norfolk City Charter. It provided for a five-member City Council, whose members were to be elected at-large for four-year terms. The terms were staggered such that three seats were to be filled during one election and the remaining two seats would be filled in an election two years later. The city manager was to be appointed by the Council. The mayor was to be elected from amongst the Council members.

### C. The At-Large System To Date

In 1949, the Norfolk City Council agreed unanimously to recommend to the Virginia General Assembly that the numbers of seats on the Council be increased from five to seven. According to the November 9, 1950 *Virginian-Pilot* article reporting passage of the referendum raising the Council membership to seven, black voters were "greatly in favor of the change." (Defendants' Exh. 38). The first election to a seven-member Council occurred in 1952.

In 1968, the City Council adopted a resolution which created an Advisory Study Commission to study and evaluate the Norfolk Charter of 1918. The Commission, after much deliberation and consideration of public comments, issued its report on November 3, 1971. The nine-member Commission unanimously recommended the retention of the at-large system for election of the members of Council because "councilmen should be elected by and be responsive to the entire community rather than a portion of it." (Defendants' Exh. 44). The report added that the "Commission wishes to avoid the dangers of a ward or district system which might encourage councilmen to look after the interests of their own district at the expense of the overall interest of the entire City." (Defendants' Exh. 44). Edward Delk, a black attorney, was a member of the Commission. He testified at trial that he continues to favor retention of the at-large system.

The 1918 Norfolk Charter continues to be in effect today.

### D. Extent of History of Official Discrimination

The early history of Virginia demonstrates efforts to defeat black participation in electoral politics. Black voters were effectively disenfranchised as a result of the 1902 Constitution, which imposed the literacy test and poll tax. The literacy test remained in effect until passage of the

2. According to the plaintiffs' expert, Dr. McCrary, there were 361 blacks registered to vote on the day of the referendum. The defend- ants' expert, Dr. Stewart, cites a figure of 358. The Court has therefore used an approximate figure of 360.

Voting Rights Act in 1965. The poll tax was declared unconstitutional by the Supreme Court in 1966. *Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). Blacks were also precluded from participating in the primary elections of the Virginia Democratic Party by the "white primary" rule which went into effect in 1912. The "white primary rule" was declared unconstitutional by the United States Court of Appeals for the Fourth Circuit in 1930. *Bliley v. West*, 42 F.2d 101 (4th Cir.1930).

Prior to the passage of the Voting Rights Act in 1965, black voter registration in Norfolk was proportionately lower than that of whites. In 1960, for example 50% of the white voting age population was registered to vote while only 25.3% of the black voting age population was registered. By October, 1964, black registration had increased to 35% of the black voting age population, while white registration had decreased to 46% of the white voting age population.

Since the passage of the Voting Rights Act in 1965, the black voter registration rate and turnout rate, based on a percentage of the black voting age population, has increased to the point that today it exceeds that of Norfolk's white population. Currently, the black voter registration rate, based on a percentage of the black voting age population, exceeds that of whites, whether one looks at the figures offered by the plaintiffs' experts or at those offered by the defendants' experts. The plaintiffs' figures show a white registration rate of 51.2% of the white voting age population and a black registration rate of 52.9% of the black voting age population under regression analysis. Under the plaintiffs' homogeneous precinct analysis, the white registration rate is 53.1% of the white voting age population and the black registration rate is 55.3% of the black voting age population.[3]

The black voter turnout rate, based on a percentage of the black voting age population, also currently exceeds that of white voters. The plaintiffs' figures show that the black turnout rate, based upon a percentage of the black voting age population, exceeded the white turnout rate in both the 1982 and 1984 City Council elections. In the May 1, 1984 election, the plaintiffs' figures show that the black turnout rate exceeded the white turnout rate by 11%.[4]

The City has made extensive efforts to increase voter registration and to make the registration process more accessible. According to the City's General Registrar, Ann Washington, as of May 31, 1984, there are twelve satellite voter registration offices located throughout the City of Norfolk. At least seven of these twelve satellite offices are located in or adjacent to predominantly black areas. In addition, the City applied for and received blanket coverage permission from the Department of Justice under Section 5 of the Voting Rights Act to conduct voter registration drives. Such registration drives have been conducted at food stamp distribution centers, the Division of Motor Vehicles, high schools and multiservice centers.

The Court finds that despite an early history of discrimination in Virginia against blacks in terms of their ability to participate in the electoral process, Norfolk's black citizens today participate in the electoral process equally with white citizens. The procedures and facilities of the Registrar's Office are fair and equally accessible to all of Norfolk's citizens.

3. These figures exclude the population on Norfolk's Naval bases or ships home ported in Norfolk. This excluded population is predominantly white and has a low voter registration rate. Inclusion of this military population would result in a white registration rate of 37% of the white voting age population and a black registration rate of 57% of the black voting age population under regression analysis, according to the defendants.

4. Again, the plaintiffs' figures exclude the predominantly white military population. Inclusion of this population would show a black turnout rate, based on a percentage of the black voting age population, three times higher than that of whites in the 1984 election, according to the defendants.

### E. Racial Polarization

The plaintiffs and the defendants each offered their own definitions of "racially polarized voting." The plaintiffs' expert, Dr. Richard Engstrom, opined that racially polarized voting occurs when the majority of one racial group votes contrary to the majority of another racial group. The defendants' expert, Dr. Timothy G. O'Rourke, suggested that three factors must be examined in order to determine whether racially polarized voting has occurred. First, the presence or absence of "white backlash," that is, whether white voters turn out in greater numbers than usual in response to the potential election of black candidates. Second, the voting patterns of black and white voters over a period of years. Finally, whether whites attempt to limit the field of candidates.

The Court rejects the definition of racially polarized voting offered by Dr. Engstrom in favor of that presented by Dr. O'Rourke. Under Dr. Engstrom's definition, most of the elections in this country, including Presidential elections, would be characterized as racially polarized. For example, as Dr. Engstrom conceded, black voters consistently and overwhelmingly support Democratic Presidential candidates. In addition, Dr. Engstrom's definition would be more appropriate in a head-to-head race than in an election such as that for the Norfolk City Council in which a voter may select more than one candidate. A vote for one candidate is not necessarily a vote against another candidate.

The Court is of the opinion that the definition offered by Dr. O'Rourke is a more sensible one. It is more applicable to the multiple-candidate, multiple-office Norfolk City Council elections. It is not overly broad, as is Dr. Engstrom's definition. Additionally, it more effectively considers voters' motivations in selecting particular candidates. Furthermore, Dr. O'Rourke's definition is consistent with the definition adopted by those few courts which have discussed the definition of racially polarized voting. See, e.g., United States v. Dallas County Commission, 548 F.Supp. 875, 904–05 (S.D.Ala.1982). The Court will therefore employ Dr. O'Rourke's definition in determining whether the Norfolk City Council elections may be characterized as racially polarized.

### 1. White Backlash

Norfolk's white voters have not turned out in greater numbers than usual in response to the potential election of black candidates. For example, in the 1984 election there were two strong black candidates, Rev. John Foster and Evelyn Butts, yet the percentage of white registered voters who turned out to vote was substantially lower than the percentage of black registered voters who turned out to vote. As a matter of fact, the 1984 turnout rate for whites, as a percentage of the white voting age population, was lower in 1984 than in any of the three previous elections. The plaintiffs' expert, Dr. Richard Engstrom, conceded that he found no evidence of white backlash.

### 2. Voting Patterns

Since the City does not maintain voter registration or turnout figures by race, statistical estimates of voting behavior were used by both the plaintiffs and the defendants. Such statistical estimates are subject to a variety of interpretations and can obviously be manipulated to support the desired result. An additional problem with these statistical estimates is that they are limited to raw numerical data, and in no way can they be said to reflect the rationale behind an individual's selection of a particular candidate.

The plaintiffs rely on two statistical studies, one prepared by Carl Peterson and Kimball Brace ("the Brace report")[5] and one prepared by Dr. Richard Engstrom, to prove that voting in Norfolk City Council elections is racially polarized. These two

---

**5.** In referring to the Brace report, the Court refers to the third and final study prepared by     Peterson and Brace, Plaintiffs' Exhibit 50–B.

statistical analyses employed data consisting of the number of registered voters in each precinct, the number of votes cast for each candidate in each precinct, and the racial composition of each of the City's 54 precincts, as determined from the 1980 Census maps. Neither of the plaintiffs' experts' studies considers factors other than race which may greatly influence voting behavior. These factors include a voter's age, ethnicity, education and income. Other factors which may influence voting behavior include incumbency, campaign expenditures, endorsements and name recognition. None of these factors were considered in the Brace report or Dr. Engstrom's report.

That these factors are relevant becomes clear if one examines, for example, the effect of incumbency on City Council elections. An examination of the elections from 1968 through 1984 shows that the incumbency success rate is over 79%. In four of the nine elections, every incumbent who sought reelection was reelected. Since 1974, every black incumbent who has sought reelection has been reelected. There is a high correlation between incumbency and election to the City Council. Yet, the plaintiffs, while admitting that incumbency plays a role in City Council elections, failed to adjust their figures to account for this factor.

Without going into great detail, the Court is convinced that the Brace report and Dr. Engstrom's report contain a number of methodological problems which cause the Court to doubt the credibility of the reports. Primary among these are the exclusion from both the Brace and Engstrom reports of those residing on Naval bases within the City limits or stationed aboard ships home ported in Norfolk. These individuals are eligible to register to vote in Norfolk City Council elections. This military population is included in the 1980 Census figures for Norfolk, and was included by the General Assembly of Virginia in the drawing of district lines for the election of the members of the Virginia Senate and House of Delegates, the State legislative bodies.

The plaintiffs' experts' reason for excluding this military population is that they are largely unregistered to vote and do not participate in City Council elections. Yet, the plaintiffs inexplicably included the City's student population, despite the fact that students also tend to be inactive members of the electorate. In addition, the plaintiffs' experts included in their studies the over 11,000 military personnel living off the Naval bases in private homes in the City.

The Court is convinced that this military population was excluded because of the effect of its exclusion on estimates of white voter participation. The racial composition of this excluded population is 84.5% white and 15.5% black, according to the 1980 Census data. Of the 33,892 members of the excluded military population who are of voting age, 84.3% are white and 15.7% are black. Exclusion of this population would have the effect of increasing white voter registration and turnout figures and, consequently, of decreasing black voter participation figures, as Dr. Brace conceded. The Court is of the opinion that the exclusion of these 33,892 potential voters in the plaintiffs' experts' studies improperly skews the results of their studies.

A second methodological problem with the plaintiffs' experts' reports was their inclusion of the so-called "other population" in with the figures for the white population when preparing and analyzing the data. This "other" population, amounting to between three and four percent of Norfolk's population, includes Asians, Native Americans and others. In other words, the plaintiffs' experts included all non-blacks in their definition of whites. The plaintiffs' experts' reports purport to compare white and black voting behavior, yet they include non-white voters within the white category. This results in an increase in the number of white registered voters and in the white voter turnout in comparison to that of black voters.

The defendants relied on the testimony of Dr. Timothy G. O'Rourke and Dr. Justin

G. Green to support their contention that voting in Norfolk City Council elections is not racially polarized. Dr. O'Rourke, in contrast to the plaintiffs' experts, considered such factors as endorsements and campaign expenses in reaching his conclusions. Drs. O'Rourke and Green avoided the methodological problems which the Court believes the plaintiffs' experts' studies suffer from. They did not exclude the military population from their analyses, nor did they include the "other" population in their studies. In addition, they went beyond the election figures, and studied newspaper articles and other data in reaching their conclusions. The Court attaches greater weight to the analyses of the defendants' experts Drs. O'Rourke and Green than to the studies of the plaintiffs' experts Dr. Engstrom, Brace and Peterson, finding them to be more credible and persuasive.

The Court's review of these studies and analyses leads it to conclude that the voting patterns reveal a substantial crossover vote. For example, in the 1978 election, 32.2% of the white voters supported Rev. Joseph N. Green, Jr. in his first election. In 1982, Rev. Green received the support of 31.1% of the white electorate. In 1984, Rev. John Foster was supported by 26.6% of the white voters. These figures show a willingness by white voters to cross racial lines when voting in City Council elections. The Court also notes that a substantial number of black voters have shown a willingness to vote for white candidates, particularly in the elections of Elizabeth Howell in 1974, 1978 and 1980, in which she received the support of a majority of black voters.

Further study of the election results reveals the importance of coalition politics in Norfolk City Council elections. Both plaintiffs' and defendants' experts agree that none of the three winning candidates in 1984 would have been elected without the support they received from both black and white voters.

The Court's review of the studies also shows that a number of unsuccessful black candidates failed to receive the support of even a majority of black voters. For example, in 1984, two black candidates, Theodore Hall and Joseph Rose, received only 8.9% and 18.7% of the votes cast by blacks, respectively. In 1982, black candidates Herbert M. Collins, a plaintiff in this action, and James F. Gay, counsel for the plaintiffs, were supported by only 27.5% and 29.6% of the black voters, respectively. In the 1980 election, George H. Banks, a plaintiff in this lawsuit, received only 34.5% of the votes cast by black voters. Another of the plaintiffs in this action, Dr. Milton A. Reid, received the support of only 36.4% of the blacks voting in the 1974 election. These black candidates were obviously not the candidates of choice of the black voters in those elections.

Between 1974 and 1984 there have been sixteen black candidates for the Norfolk City Council. Four of those candidates have been elected. Eight of the remaining black candidates failed to receive the support of even a majority of the black electorate. The remaining four black candidates are actually only two individuals: Evelyn T. Butts in 1980, 1982 and 1984, and Lenious G. Bond in 1972. Mrs. Butts would most likely have been elected in 1984 had she received the same level of black support she received in her earlier races, which dropped from a high of 92.9% in 1980 to 72.1% in 1984.

The Court also finds, as the parties agree, that the current rate of black voter registration and turnout is proportionately higher than that of the white population. One would expect the opposite to be true under a racially polarized voting system with a majority of white voters. After thoroughly reviewing the voting behavior studies presented by the plaintiffs and defendants, the Court finds that the voting patterns in Norfolk City Council elections do not reflect racial polarization.

3. *Efforts to Limit the Field of Candidates*

The field of candidates in City Council elections since 1968 has ranged from eight in 1968, when three seats were available, to

twenty-one in 1974, when four seats were available. In the most recent election, held May 1, 1984, ten candidates sought to fill three seats on the Council. For the elections which were held from 1968 through 1984, the average number of candidates per election was thirteen.

The evidence fails to disclose any effort on the part of whites to limit the field of candidates and the statistics support this conclusion. There was no evidence offered to suggest that any individual who desired to seek a position on the City Council was prevented or even dissuaded from doing so.

#### 4. *Summary*

In summary, the Court finds no evidence of white backlash. The Court further finds that a thorough examination of the voting behavior of Norfolk's black and white voters fails to reveal a racially polarized electorate. Finally, the Court finds no evidence of efforts by whites to limit the field of candidates. Applying Dr. O'Rourke's definition of racially polarized voting, the Court concludes that voting in Norfolk City Council elections is not racially polarized.

### F. *Enhancing Factors*
#### 1. *Existence of Unusually Large Election Districts*

Under the at-large system, the election district obviously consists of the entire fifty-three square mile City. The Court is not convinced, however, that the size of the election district, that is of the City, enhances the opportunity for discrimination against black residents. Although the plaintiffs allege that it would be easier and less costly to run for the City Council under a ward system, they presented no statistical evidence to support this contention. It is conceivable that there would be no decrease in the cost of running for City Council under a ward system because head-to-head competition may in fact cause costs to escalate.

#### 2. *Majority Vote Requirements*

There is no majority vote requirement in Norfolk City Council elections. Council members are elected by a plurality of the votes cast, regardless of whether they have received a majority of the votes cast. In fact, in every City Council election from 1968 through 1984, the candidate with the lowest total vote of those elected has received less than 50% of the vote. Four of those candidates with the lowest winning total received less than 45% of the votes cast.

#### 3. *Anti-Single-Shot Provisions*

There are no prohibitions against casting single-shot ballots in Norfolk City Council elections. In fact, the evidence shows that black voters have on occasion successfully employed single-shot tactics.

#### 4. *Staggered Terms*

The members of the Norfolk City Council serve staggered four-year terms. Generally, four seats are filled in one election and three seats are filled in the following election. In two of the nine elections held since 1968, however, more than four seats were up for election. Six seats were available in 1970 and five seats were available in 1978, due to vacancies on the Council.

The plaintiffs allege that staggered terms increase the likelihood of head-to-head racial contests and minimize the effect of single-shot voting. If, as the plaintiffs allege, staggered terms have a discriminatory effect upon Norfolk's City Council elections, it would be expected that in those years in which the fewest seats were up for election blacks would be unsuccessful in seeking office. To the contrary, in four of the five elections held since 1968 in which three seats were available a black has been elected, that is, Joseph Jordan in 1968, 1972, and 1976, and Rev. John Foster in 1984.

Furthermore, the plaintiffs' allegation with regard to head-to-head contests is not supported by the evidence. The field of candidates in City Council elections since 1968 has ranged from eight in 1968, when three seats were available, to twenty-one in 1974, when four seats were available. For

the elections which were held from 1968 through 1984, the average number of candidates per election was thirteen. The large field of candidates in Norfolk City Council elections minimizes the likelihood of head-to-head contests.

### 5. *Numbered Post or Residency Requirements*

There are no numbered post or residency requirements governing Norfolk City Council elections. A numbered post requirement, which would require candidates to seek particular seats on council, would create head-to-head contests, which the plaintiffs find objectionable. A residency requirement, which would in effect be equivalent to a numbered post requirement, similarly would encourage head-to-head contests.

### 6. *Summary*

In summary, the Court finds that the City has not used any of the enumerated voting practices or procedures to discriminate against black voters.

### G. *Candidates Slating*

Defense witness Dr. Timothy J. O'Rourke, a University of Virginia political scientist, defined a slating group as "a permanent or semipermanent organization who [sic] recruits candidates to run for office. Having recruited them, [it] puts them up as a slate for as many seats as are open, and organizes a campaign and promotes those candidates in a campaign as a slate." (Tr. 1961–62). As an example of slating groups, Dr. O'Rourke cited political party organizations. (Tr. 1962). The Court adopts the definition of a slating group offered by the defendants.

The plaintiffs allege that an all-white group of businessmen, referred to as the "westside businessmen's coalition" during the trial, has twice run a slate of all-white candidates and that no blacks were ever asked by the members of the group to run on its slate. The plaintiffs refer to the 1976 election in which Vincent J. Thomas and G. Conoly Phillips ran for election to-

gether and the 1980 election in which Thomas and Phillips ran with Joseph A. Leafe.

The plaintiffs implied throughout the trial that this "westside businessmen's coalition" has sufficient influence to determine who will be elected to the City Council. The plaintiffs offered no evidence, other than the testimony of the plaintiffs themselves, that this "westside businessmen's coalition" is a slating organization and the Court finds that this group does not constitute a slating organization as defined by Dr. O'Rourke. When Thomas and Phillips ran together in 1976, although there were three seats up for election, the two candidates did not ask a third candidate to run with them. A slate, as defined by Dr. O'Rourke, consists of as many candidates as there are seats available. Accordingly, the Thomas-Phillips ticket could not constitute a slate. While Phillips and Thomas may have been asked to run by individual members of the business community, there is no evidence that they were recruited to run by a slating organization.

With regard to the 1980 election, Joseph Leafe testified that he was asked to run by then Mayor Thomas. Leafe had decided not to run again for the Virginia House of Delegates, in which he had served as a member from 1972 to 1980. Leafe stated that he did not have discussions with either Joshua Darden or Harvey Lindsey, identified during the trial by the plaintiffs as leaders of the "westside businessmen's coalition," before he decided to run. Leafe was not recruited to run by any single group; rather he was encouraged to run by voters from throughout the City. Leafe ran with Thomas and Phillips in 1980 and the three shared election expenses. They did not consider themselves to be a businessmen's slate. Leafe and Thomas were elected; Phillips was not. There is no evidence that the three candidates were recruited by a slating organization. It is more likely that the two incumbents, who had run together successfully in the 1976 election, sought a third candidate who shared their stance on the issues and who

would be willing to share campaign expenses. The plaintiffs' theory, that this so-called "westside businessmen's coalition" is controlling the Norfolk City Council elections, is not supported by credible evidence.

The only possible example of slating by an organization in Norfolk City Council elections, as established by the evidence, occurred in 1982, when the City Democratic Committee endorsed a biracial slate of two black and two white candidates. The two black candidates who were members of that slate were Herbert M. Collins, a plaintiff in this action, and James F. Gay, counsel for the plaintiffs in this action. All four of the candidates who ran on the Democratic Committee slate failed to win election.

Both the plaintiffs and defendants agree that the Concerned Citizens of Norfolk, a black political organization, has endorsed both black and white candidates for Council, but that the group is not a slating organization because it neither recruits candidates for office nor runs the endorsed candidates on a slate.

In summary, the Court finds that the only possible candidate slating by an organization which has occurred in Norfolk City Council elections occurred in 1982, when the City Democratic Committee endorsed a biracial slate of candidates. The Court further finds that the plaintiffs failed to prove the existence of a candidate slating organization which denies black candidates access to the process.

### H. Socio-economic Disparities

#### 1. Education

According to the 1980 Census, the percentage of adult blacks (25 years or older) in Norfolk with no more than an elementary school education is 31.15%, a drop of 16.18% from the figure reported in the 1970 Census. The percentage of adult blacks in Norfolk with less than four years of high school education is 55.3%, according to the 1980 Census, a drop of 18% from the 1970 figure. By way of comparison, 1980 Census figures show that 12.0% of Norfolk's adult whites have only an elementary school education, and that 29.8% of the adult white population has less than four years of high school education. Of the total adult population with four or more years of college, blacks comprised 16.48% and whites 72.2%. The 1970 figure for blacks was 12.95%, showing an increase in the number of college educated blacks.

#### 2. Income

According to the 1980 Census statistics, 35.46% of all black persons residing in Norfolk have incomes below the poverty level, compared to 11.5% of all white persons. This figure reflects a drop of almost 4% from 1970 for black persons. The 1980 Census figures also show that the median income for Norfolk's whites is $17,548, while the median income for Norfolk's blacks is $10,258.

#### 3. Housing

According to the 1980 Census, over 10% of all housing units occupied by blacks have more than one person per room, as compared with less than 2% of white-occupied households. The 1970 Census figures reflect a decrease in black households having more than one person per room of over 8% over the last decade. The 1980 Census figures also reflect that the median value of white owner-occupied households exceeds that of black owner-occupied households by $11,100.

#### 4. Employment

The 1980 unemployment rate for blacks (11.9%) is more than twice that of whites (5.3%).

#### 5. Health

The plaintiffs assert that the 1982 infant mortality rate and 1982 rate of new cases of tuberculosis in Norfolk were higher for blacks than for whites. The Court is unable to verify these figures because the plaintiffs did not indicate the source of their figures.

### 6. *Effect of Socio-economic Disparities*

Despite the disparities between the black and white citizens of Norfolk in the areas of education, employment, housing and income, the voter participation figures show that they have not hindered the participation of Norfolk's blacks in the electoral process. Blacks are registering to vote and turning out to vote at rates equal to or greater than the rate for whites, based on a percentage of the voting age population.

One longtime observer and participant in Norfolk politics, Judge Joseph A. Jordan, Jr., a black former City Council member testified that the failure of blacks to vote in Norfolk elections cannot be blamed on the economic status of blacks. He places the blame, at least in part, on the black leadership's failure to continue efforts begun in the 1950's aimed at achieving total black suffrage in Norfolk, and which were subsequently discontinued by the blacks. (Tr. 1521–23).

The Court is pleased to note that the position of Norfolk's black residents has improved in the areas of education, housing and employment in recent years. This may well be in some part due to their continued and increasing participation in the political process.

### I. *Racial Appeals*

The plaintiffs point out only one City Council campaign that they contend was characterized by appeals to the racial prejudices of white voters. The plaintiffs allege, and their expert Dr. Jerry Himelstein, a sociologist, testified, that the 1982 campaign was characterized by subtle and overt racial appeals. Dr. Himelstein's conclusion was based solely on a study of newspaper accounts of the 1982 campaign during the four months preceding the election. He testified that the two dominant themes which emerged were public school busing as a racial issue and the issue of black representation on the City Council.

Dr. Himelstein testified that his opinion that the school busing issue constituted a racial appeal was confirmed by an examination of the Brace report's 1982 election statistics and by a letter from former Lieutenant Governor Henry E. Howell, Jr. to then Mayor Vincent Thomas, which appeared in *The Virginian-Pilot.* Dr. Himelstein suggested that the issue of busing effected the outcome of the election because the three white candidates who were elected, Dr. Mason C. Andrews, Claude J. Staylor, Jr. and Robert E. Summers, all opposed busing. The Court believes, however, that the election of these three candidates can as easily be attributed to their incumbency, and that Dr. Himelstein's suggestion that they were elected because of their opposition to busing is unsubstantiated.

Dr. Himelstein's other so-called confirmation of his analysis, the Howell letter to Thomas, is equally lacking in validity. Howell testified that his letter, in which he urged Thomas to reconsider his opposition to busing, "didn't have anything to do with the campaign." (Tr. 1584). Howell further testified that he never heard any discussions of busing by candidates during the 1982 election that he would characterize as racial appeals.

The Court concludes from the evidence that the issue of public school busing was a legitimate public concern and not an appeal to racial prejudices. Both black and white candidates addressed the issue of busing during the 1982 campaign, although many of the candidates spoke to the issue reluctantly and often only when questioned by the public about their stance on the issue. The evidence fails to show that any of the candidates intended to, or did in fact, use the issue to appeal to the racial prejudice of voters.

Dr. Himelstein also testified that news accounts of the 1982 campaign frequently discussed the race of the candidates and raised the issue of black representation on the Council. It appears to the Court, from reading the newspaper accounts, that this issue was one raised by the black candidates. There was no evidence that this issue constituted an appeal to the racial prejudice of voters.

The Court concludes that the evidence fails to show that the 1982 campaign was characterized by subtle or overt racial appeals. In fact, Rev. Joseph N. Green, Jr., a black member of the Council, was reelected in the 1982 election with the support of over 30% of the white voters. The statistics indicate that Rev. Green received approximately the same support from white voters in 1982 as he received in the 1978 election, indicating no withdrawal of white support from Rev. Green, who favored school busing. The plaintiffs do not suggest that racial appeals were made in any other City Council election.

*J. Election of Blacks to Public Office*

Blacks currently hold elective positions on the Norfolk City Council, in Norfolk's delegation to the Virginia House of Delegates, and as the sheriff of the City of Norfolk. Two blacks, Revs. Joseph N. Green, Jr. and John Foster, currently serve on the seven-member City Council. Two blacks, William P. Robinson, Jr. and Dr. Yvonne Miller, are members of Norfolk's five-member delegation to the Virginia House of Delegates. The sheriff of the City of Norfolk is David Mapp, a black.

Since at-large elections were instituted in 1918, three blacks have been elected to membership on the Norfolk City Council. At least one black has served on the Council continuously since 1968. Joseph A. Jordan, Jr., a black, was first elected to the City Council in 1968 and was reelected in 1972 and 1976. He served as vice mayor during his last two terms, a position to which he was elected by the members of the Council. Following Jordan's appointment to a judicial position in 1977, Rev. Joseph N. Green, Jr., a black, was appointed to fill Judge Jordan's unexpired term. Rev. Green was elected to the Council in 1978 and again in 1982. He has served as vice mayor since 1982 and was recently reelected to that office, Rev. John Foster, a black, was elected to the City Council on May 1, 1984.

As a result of Rev. Foster's election, two blacks, Revs. Green and Foster, will serve on the seven-member Council through June 30, 1986. The plaintiffs insinuated throughout the trial that the election of Rev. Foster to the Council, which occurred after the filing of this lawsuit, was an attempt by unnamed white city officials and other community leaders to moot this action. The plaintiffs point to former Mayor Vincent Thomas' decision to forgo seeking reelection in 1984, and suggest that his decision was part of this alleged conspiracy. Mayor Thomas stated that he decided not to seek reelection in 1984 for personal reasons. He further stated that his support for the election of a second black to Council predated the filing of this action and the Court is not persuaded to the contrary by the plaintiffs' innuendo. There is no evidence that the election of Rev. Foster was orchestrated by white city officials or community leaders in an attempt to moot this action.

Norfolk's delegation to the Virginia House of Delegates has included at least one black member since 1969, when William P. Robinson, Sr. was first elected. Robinson, Sr. served in the House of Delegates until his death in 1981. Following his death, his son, William P. Robinson, Jr., was elected a member of Norfolk's delegation to the House of Delegates and he remains a member, having been reelected in 1983. In 1982, Norfolk was divided into single-member districts for the election of members of the House of Delegates, those elections having previously been conducted at-large. In the 1982 special election, the first conducted under the single-member districts plan, Robert Washington, a white, defeated William Swindell, a black and a plaintiff in this lawsuit, in a head-to-head race to represent the newly created 89th District, a predominately black district. In 1983, Delegate Washington declined to seek reelection, and Dr. Yvonne Miller, a black, ran unopposed for election to the House of Delegates from the 89th District. Consequently, two of the five current members of Norfolk's delegation to the Virginia House of Delegates are black, Delegates Miller and Robinson.

David Mapp became the first black elected to a constitutional office in Norfolk when he was elected sheriff in 1981. In the primary election, Sheriff Mapp defeated a white challenger in a head-to-head contest. In the general election he overwhelmingly defeated three white candidates. Sheriff Mapp received the endorsements of the outgoing sheriff, a white, and the Democratic party.

## K. Responsiveness

### 1. Appointments to Boards and Commissions

The plaintiffs contend, and their expert Dr. Loren Solnick, a labor economist, testified, that black residents are underrepresented on Norfolk's appointive boards and commissions. The parties have stipulated to the racial composition of the 58 boards, commissions and authorities appointed in whole or in part by the Norfolk City Council. Of the 438 appointive positions, 344, or 78.54%, are filled by white residents and 94, or 21.46%, are filled by black residents. Seventeen of the boards and commissions are all-white, including the Granby Mall Advisory Commission, the Municipal Bond Commission, the Police-Fire Trial Board, and the Tidewater Community College Board. One of the boards, the Southeastern Tidewater Opportunity Project Board of Directors, is all-black. Two of the boards and commissions have a majority black membership and an additional two have an equal number of black and white members.

These figures, taken alone, would suggest, as Dr. Solnick testified his study shows, that blacks are indeed underrepresented on the City's appointive boards and commissions, considering that blacks constitute 31.48% of Norfolk's voting age population and only 21.46% of the appointive positions are held by blacks. The defendants presented evidence, however, in the form of City ordinances, which shows that in order for a citizen to serve on certain boards and commissions he or she may be required to meet certain criteria. Such criteria include special knowledge, experience, training or education in the relevant field.

In addition, some of the members of certain commissions and boards are required to be representatives of particular groups or sectors of the community. For example, City Code Section 31.47 provides that the five members of the Granby Mall Advisory Commission shall consist of: one representative of the Norfolk Redevelopment and Housing Authority, one representative of the Downtown Norfolk Association, one representative of the Norfolk Chamber of Commerce, one representative of the Retail Merchants Association, and one representative of downtown business interests. Over seventy-five of the seats on boards and commissions carry with them special qualifications as contained in the City ordinances.

The plaintiffs' expert, Dr. Solnick, assumed in his study that every person in the voting age population is eligible to serve on the boards or commissions. This is obviously a flawed assumption, as demonstrated by the evidence offered by the defendants. When confronted with the defendants' evidence, Dr. Solnick admitted that he failed to consider these special requirements in his study. The plaintiffs failed to respond with any more accurate figures, which would take into account the special qualifications needed to serve on many of the boards and commissions, despite having the opportunity to do so on rebuttal. The plaintiffs having failed to present an accurate study upon which the Court could base an evaluation, the Court is unable to find that the City has failed to appoint blacks to boards and commissions in proportion to their representation in the voting age population of the City. The Court notes, however, that blacks are well-represented on the more important boards and commissions, such as the School Board, the Norfolk Redevelopment and Housing Authority Board of Commissioners, the City Planning Commission, and the Civil Service Commission.

## 2. City Employment

The plaintiffs contend, and their expert Dr. Loren Solnick testified, that his study shows that blacks are underrepresented in City government supervisory positions, as well as in the Norfolk Police and Fire Departments. The parties have stipulated that as a percentage of total municipal employment, blacks comprised 36.16% of the municipal work force in 1973 and 41.31% of the work force in 1983. According to the City's 1983 EEO-4 report, as amended, the percentage of black city employees in each of the following job categories was:

| | |
|---|---|
| Officials/Administrators | 5.5 % |
| Protective Services | 10.02% |
| Professionals | 31.77% |
| Paraprofessionals | 60.28% |
| Technicians | 23.11% |
| Office/Clerical | 39.48% |
| Skilled Craft Workers | 42.11% |
| Service Maintenance | 81.74% |

In Dr. Solnick's study he compared the City's employment of blacks in these eight occupational categories with the 1980 Census data for the Norfolk SMSA, specifically the employment of blacks and whites in comparable occupational groups. The plaintiffs allege, based on Dr. Solnick's study, that blacks are particularly underrepresented in the officials/administrators and protective services categories. The plaintiffs' study found no underrepresentation of city employees in the remaining six categories: professionals, paraprofessionals, technicians, office/clerical, skilled craft workers and service maintenance.

With regard to officials and administrators, Dr. Solnick's comparison included figures from the 1980 SMSA Census tables for public officials and administrators at the federal, state and local levels. The Court agrees with the defendants that the more appropriate comparative group would be limited to officials and administrators employed at the local level. Using that group as the comparison, the difference between the City's black officials and administrators (5.5%) and the figure drawn

from the Census tables (6.5%) is insignificant.

With regard to protective services employees, a category which in the City of Norfolk is limited to police and firefighters, the Court points out that the City's hiring in the Police and Fire Departments has been controlled by a consent decree entered by another Judge of this Court in the case of United States v. City of Norfolk, Civil Action No. 78–418–N (E.D.Va. Aug. 28, 1978). The evidence shows efforts by the City to recruit black applicants for positions in the Police and Fire Departments. In addition, the percentage of blacks in the City's Police and Fire Departments does not differ significantly from the 1980 SMSA Census figures for blacks employed in police and firefighting occupations.

The Court notes that the plaintiffs did not present any evidence of qualified black applicants being turned down for City employment.

## 3. Libraries

The parties have stipulated that both in terms of location of libraries and programs offered, the Norfolk City Libraries Department does not discriminate against black citizens and is responsive to the needs of black citizens.

## 4. Fire Department Services

The parties have stipulated that both in terms of locations of fire stations and responses to fire alarms, the Norfolk Fire Department does not discriminate against Norfolk's black citizens and is responsive to the needs of black citizens.

## 5. Police Department Services

The plaintiffs offered little evidence of discrimination by the Norfolk Police Department against black citizens. The Court finds on the basis of the evidence offered by the defendants that the Police Department has undertaken a series of community relations efforts designed to improve its relations with the black community. These efforts include the establishment of a Police Community Relations Unit, the mainte-

nance of storefront operations in black neighborhoods, and the creation of the Block Security and Comprehensive Crime Prevention programs. The Court further finds that the Police Department is responsive to the needs of black citizens.

### 6. *Social Services*

The parties have stipulated that in terms of location of facilities and services provided, the Norfolk Department of Human Resources does not discriminate against black citizens and is responsive to the needs of Norfolk's black citizens. The defendants' evidence shows that the City offers a variety of social service and public assistance programs which have primarily benefitted black residents.

### 7. *Health Services*

The plaintiffs offered no evidence that the Norfolk Department of Health discriminates against black citizens or is unresponsive to their needs. The Court finds, on the basis of the evidence offered by the defendants, that the City offers numerous health programs which have primarily benefitted black residents.

### 8. *Parks and Recreation*

The plaintiffs offered no evidence that the Department of Parks and Recreation is unresponsive to the needs of black citizens. The evidence offered by the defendants shows that City's recreational facilities and services are utilized by black residents at a greater rate than that of white residents.

### 9. *Cemeteries*

The plaintiffs offered no evidence that the City's cemeteries are operated in a discriminatory manner, and the Court finds that the defendants have demonstrated that the City's eight cemeteries are operated on a nondiscriminatory basis.

### 10. *Education*

The plaintiffs attempted on several occasions to raise the issue of public school busing in this case. The Court declined to permit them to do so. The Court refers the parties to Judge MacKenzie's opinion in *Riddick v. School Board of City of Norfolk,* Civil No. 83–326–N (E.D.Va. July 9, 1984). The plaintiffs have failed to establish any discrimination against black students in the Norfolk public school system. In fact, the Superintendent of Schools is black.

### 11. *Public Works and Utilities*

The plaintiffs presented little evidence of a lack of responsiveness by the Department of Public Works to the needs of black residents. The Court finds on the basis of the evidence offered by the defendants that the Department of Public Works provides street lighting, paved roads, drainage, solid waste removal and street cleaning to all parts of the City on a nondiscriminatory basis and is responsive to the needs of black residents. The plaintiffs offered no evidence that the Department of Public Utilities discriminates in its provision of water and sewer services to the City's residents, and the Court finds no such discrimination.

The Court finds that since 1970, the City has expended millions of dollars on capital improvement projects in predominantly black neighborhoods. The parties agree that from 1970 through September, 1983, the City of Norfolk spent over $9.3 million in Berkley, a predominantly black-occupied area of Norfolk, and allocated an additional $3.5 million to be spent. The funds were spent on capital projects including street repairs, a senior citizen center, branch library replacement, fire station replacement and neighborhood facilities program. Of the funds already spent, approximately $6.5 million was federally funded and $2.5 million was locally funded. Of the funds yet to be spent, $.5 million will be federally funded and $3 million will be locally funded.

The parties also agree that from 1969 through October, 1983, the City has spent over $19 million in the Church Street/Huntersville area, another predominantly black-occupied area of Norfolk, with an addition-

al $4.9 million allocated to be spent. The funds were spent on capital improvement projects including street repairs, cemetery repairs, day care center acquisition, and rehabilitation to Young Park, a subsidized housing project. Of the over $19 million already spent, $17.5 million was federally funded and $1.7 million was locally funded. Of the $4.9 million yet to be spent, $4.8 million will be federally funded and $1 million will be locally funded.

## 12. *Housing*

### a. *Code Enforcement*

The plaintiffs presented no evidence of discriminatory enforcement of the City Housing Code by the Department of Community Improvement or the Division of Housing Services. The Court is persuaded by the evidence offered by the defendants that the Department of Community Improvement and the Division of Housing are responsive to the needs of black residents, and that many of the programs offered are designed to benefit the City's black citizens.

### b. *Urban Redevelopment*

The plaintiffs contend that the Norfolk Redevelopment and Housing Authority (NRHA) has not been responsive to the needs of black residents. The NRHA was established by the City in 1940, pursuant to State enabling legislation. The Norfolk City Council appoints the NRHA Board of Commissioners. The plaintiffs point out, and the defendants concede, that of the 21 commissioners who have served on the NRHA since 1940, only three have been black. Two of the five current commissioners, however, are black. The NRHA's main functions are the prevention and removal of slums and blight and the provision of low- and moderate-income housing in Norfolk.

The plaintiffs have alleged that the NRHA has not replaced low-income housing which was demolished through slum clearance programs with other low-income housing on a one-to-one basis. David H. Rice, executive director of the NRHA, tes-

tified that this allegation is factually incorrect, and that in fact, the number of low-income housing units which were made available exceeds the number of low-income units which were demolished. According to NRHA figures, during the period from 1950 to the date of trial, the NRHA was responsible for the demolition of 10,900 low-income housing units as part of its slum clearance and urban renewal efforts. During the same time period, NRHA figures indicate that the NRHA was responsible for the production of 9,615 new low-income housing units, made available an additional 552 units under a federally subsidized housing program known as "Section 8," and rehabilitated 74 units using Section 8 funds. In addition, the NRHA, under its own conservation program, rehabilitated another 3,000 units by improving their condition from "substandard" to "standard." Totaling these figures, it appears that the NRHA has made available for occupancy 13,241 low-income housing units during the period from 1950 to the date of trial, over 2,300 more than were demolished during the same period.

These figures, which the Court finds to be credible, rebut the plaintiffs' allegation that the NRHA has not replaced low-income housing on a one-to-one basis. The Court further finds that all persons displaced by NRHA programs are required by NRHA procedures to be relocated into "decent, safe and sanitary housing," and that these procedures have been complied with. (Tr. 1739, 1741).

### c. *East Ghent*

The plaintiffs rely upon the redevelopment of East Ghent to bolster their claim that the NRHA's policies and programs are racially discriminatory. Both parties agree that prior to redevelopment, East Ghent was a severely run-down predominantly black neighborhood. According to NRHA executive director Rice, approximately 1,800 families, almost all of whom were black, were relocated as a result of the East Ghent redevelopment project. The plaintiffs contend that those who were relo-

cated were given indications that they would be able to return to East Ghent when redevelopment was completed. Mr. Rice concedes that in the early stages of the redevelopment project, indications were made that the NRHA would include some subsidized housing in its plans for East Ghent.

A 150-unit federally subsidized housing project for the elderly was the first housing built in East Ghent. In 1974, the NRHA Board of Commissioners made a decision not to locate any additional low-income housing projects in East Ghent. This decision was based upon a desire to attract middle-income families back into the City's downtown area to provide a much needed tax base. Other considerations included the fact that the federal programs that provided subsidies for privately owned housing had been halted in 1974. The City Council approved the NRHA's application to rezone the East Ghent area from R–4 (Multiple Residence District), R–5 (Multiple Residence District), C–1 (Neighborhood Commercial District), C–3 (General Commercial District) and M–1 (Limited Manufacturing District) to PD–H (Planned Development District—Housing) on November 5, 1974 by a 6–1 vote. According to Carroll A. Mason, who was then Area Director of the United States Department of Housing and Urban Development, HUD agreed with the City's assessment of the need to broaden its tax base.

The Court concludes that the NRHA's decision to promote middle-income housing in East Ghent was not racially motivated, but rather was motivated by a genuine desire to broaden the City's downtown tax base. In addition, the Court finds that the NRHA's decision was consistent with the City's efforts to revitalize its downtown area.

d. *Community Development Block Grant Programs*

Since the mid-1970's, the City has participated in Community Development Block Grant (CDBG) programs administered by the United States Department of Housing

and Urban Development (HUD). The CDBG program provides federal funds for such purposes as programs benefitting low- and moderate-income persons. During the years of its participation in the CDBG programs, the City has received nearly $100 million in federal funds.

The plaintiffs have alleged that the NRHA has repeatedly violated federal statutes and regulations with regard to achieving racial balance in public housing projects. The defendants contend that the City's funds have never been reduced, delayed, suspended, or disapproved by the Federal government for any reason, including any violation of federal statutes or HUD regulations. The Court has thoroughly reviewed the testimony and the documentary evidence on both sides. The Court accepts as credible the testimony of past and present NRHA officials that they have had little success in their attempts to achieve racial balance in the City's public housing projects because: (1) HUD regulations require that preference for placement in projects be given to those who have been displaced, and those Norfolk residents who have been displaced are overwhelmingly black; (2) HUD prohibits the use of quotas or preferential treatment on the basis of race to ensure racial balance; and (3) those who seek public housing in Norfolk are predominantly black. The NRHA officials' testimony is supported by the testimony of Carroll Mason, former Area Manager of HUD. The Court finds that it would be impossible for the City to achieve racial balance in its housing projects when it does not have enough white applicants to achieve that goal.

e. *Racial Integration of Neighborhoods*

The plaintiffs allege that the City of Norfolk is racially segregated, in large part due to the NRHA's placement of public housing projects in predominantly black neighborhoods. The defendants contend that this is not so, citing the testimony of urban demographer Dr. William A. Clark that Norfolk is "a reasonably well integrat-

ed city." (*Riddick*, Tr. 3069). The defendants further rely on Dr. Clark's studies to show that even a random allocation of the City's public housing projects would have had only a minor impact on the racial make-up of the City's neighborhoods. The Court finds no evidence to the contrary and therefore concludes that the plaintiffs have failed to substantiate this claim.

13. *Summary*

The Court finds evidence of substantial black-employment in City jobs, significant black representation on appointive boards and commissions, considerable expenditures of federal and local funds in black occupied areas, and a nondiscriminatory provision of essential city services and capital improvements to black residential neighborhoods.

L. *Tenuousness of Policies Supporting At-Large Elections*

The plaintiffs suggest that the use of an at-large election system in Norfolk is pursuant to a tenuous policy. The Court finds, to the contrary, that the policy is by no means tenuous.

As defendants' expert, Dr. Timothy J. O'Rourke, testified, the city manager-council form of government is associated with the at-large election system throughout the nation. According to a 1981 survey, of the cities nationwide with populations of between 250,000 and 500,000 which have council-manager forms of government, over 75% have at-large elections for council.

All of Virginia's forty-one cities have the council-manager form of government. Only six of those cities do not have at-large elections for council. The cities of Petersburg, Richmond and Lynchburg abandoned at-large elections after Justice Department objections to proposed annexations under Section 5 of the Voting Rights Act. Suffolk's abandonment of the at-large system dates to a city-county consolidation. Hopewell abandoned at-large elections in settlement of a Section 2 action. Winchester, Lynchburg and Hopewell have adopted systems in which some council members are elected from wards and some at-large. The remaining thirty-five Virginia cities have at-large elections.

The Court concludes that Norfolk's policy of at-large City Council elections is consistent with both national and State practices for cities with the council-manager form of government. The Court finds no evidence that Norfolk's at-large election system is the product of a tenuous policy.

M. *Black Participation in the Electoral Process in Norfolk*

The extent of black participation in Norfolk's elections is best illustrated by an examination of the role which the Concerned Citizens of Norfolk, a black political organization, has played, as well as an examination of the participation of blacks in the City Democratic Party.

1. *The Concerned Citizens of Norfolk*

Founded in the 1960's, the Concerned Citizens has become the most influential black political organization in Norfolk. The original co-directors of the group were Joseph A. Jordan, Jr. and Dr. William P. Robinson, Sr., both black residents of Norfolk. Dr. Robinson served as a member of the City's delegation to the Virginia House of Delegates from 1969 until his death in 1981. Joseph A. Jordan, Jr. served on the City Council from 1968 until 1977 and served as vice mayor from 1972 to 1976. He was appointed to a judgeship on the General District Court in 1977. Both were elected repeatedly in at-large elections. Today, the co-directors of the Concerned Citizens are William P. Robinson, Jr., a member of Norfolk's delegation to the Virginia House of Delegates since 1981, and Mrs. Evelyn T. Butts, who has unsuccessfully sought a seat on the City Council three times.

Prior to each election in Norfolk, a committee of the Concerned Citizens interviews the candidates who are seeking the organization's endorsement. The group's endorsements are presented primarily

through the issuance of the Goldenrod guide ballot, which lists the names of the endorsed candidates. The guide ballot is widely distributed on election day.

The effectiveness of the Concerned Citizens' endorsements in garnering the votes of black citizens for the endorsed candidates can be seen from a review of several City Council elections. In 1974, for example, the Concerned Citizens endorsed two white candidates, Elizabeth Howell, wife of former Lieutenant Governor Henry E. Howell, Jr., and Claude J. Staylor, Jr., former Norfolk Chief of Police. The organization also endorsed a black candidate, Lenious G. Bond. Three other black candidates were amongst the field of twenty-one candidates, including Dr. Milton A. Reid, a plaintiff in this action. Dr. Reid sought, but did not receive, the Concerned Citizens' endorsement. Mrs. Howell received over 58% of the black vote[6] and Mr. Staylor received over 56% of the black vote and both were elected. Mr. Bond received 73% of the black vote, while Dr. Reid received only 36% of the black vote.

In 1980, the Concerned Citizens again endorsed Mrs. Howell. The organization also endorsed one black candidate, Mrs. Evelyn T. Butts, the co-director of the group. The only other black candidate in the field of twelve was George H. Banks, a plaintiff in this lawsuit. Mr. Banks was not endorsed by the Concerned Citizens, and received only 34.5% of the black vote. The endorsed candidates, Mrs. Howell and Mrs. Butts, received 72.9% and 92.9% of the black vote, respectively.

In the 1982 election, there were four black candidates in the field of fourteen. The Concerned Citizens endorsed two of the black candidates, Rev. Joseph N. Green, Jr. and Mrs. Butts. The two other black candidates, Herbert M. Collins, a plaintiff in this action, and James F. Gay, counsel for the plaintiffs, were not endorsed. Mr. Collins and Mr. Gay each received less than one-third of the black vote, whereas Rev. Green and Mrs. Butts each received over 87% of the black vote.

The Concerned Citizens endorsed two black candidates, Rev. John Foster and Mrs. Butts, and one white candidate, Joseph Leafe, in the 1984 election. Two black candidates who ran without the Concerned Citizens' endorsement, Theodore Hall and Joseph Rose, received 8.9% and 18.7% of the black vote, respectively. Mr. Leafe, who received only 1.7% of the black vote in 1980 when he ran without the Concerned Citizens endorsement, received 19.6% of the black vote in 1984, more than either Hall or Rose. Mrs. Butts received 72.1% of the black vote and Rev. Foster received 79.9%.

The plaintiffs have acknowledged the effectiveness of the Concerned Citizens' endorsements. In addition, the group's effectiveness is demonstrated by their success rate. From 1978 through 1984, the Concerned Citizens has endorsed twenty-one candidates, both black and white, for the Norfolk City Council. Thirteen of those candidates, five black and eight white, have been elected. From 1970 to the present, the City Council has included at least two, and sometimes three, members who were endorsed by the Concerned Citizens, and who received a majority of the black vote. Six of the seven current Council members were endorsed by the Concerned Citizens in at least one of their campaigns.[7]

2. *The City Democratic Party*

The parties agree that Norfolk's black citizens generally support Democratic candidates in partisan elections. Approximately 31% of the Norfolk City Democratic Committee members are black. Two of the Committee's six officers, the first vice-chairman and the treasurer, are black.

There have been close ties, historically, between the black members of the City

---

**6.** The figures in this section are all based on homogeneous precinct analysis.

**7.** The Council members and their year/s of endorsement are as follows: Dr. Mason C. Andrews (1978), Rev. John Foster (1984), Rev. Joseph N. Green, Jr. (1978, 1982), Elizabeth Howell (1974, 1978, 1980), Joseph Leafe (1984) and Claude J. Staylor, Jr. (1974).

Democratic Committee and the leaders of the Concerned Citizens of Norfolk. In 1981 and 1982, however, a rift occurred in the City Democratic Committee which was related to the 1982 City Council campaign and involved several of the plaintiffs in this action.

In the fall of 1981, an election of precinct committee members was scheduled, but Party Chairman William P. Williams failed to notify Mrs. Butts, co-director of the Concerned Citizens, of the filing deadlines, as had been done customarily by past party chairmen. As a result, many persons who had previously served as precinct committee members missed the filing deadline and consequently were replaced. Approximately one-half of the precinct committee members were replaced by new precinct committee members. Herbert M. Collins, a plaintiff in this action, was among the new precinct committeemen. Mrs. Butts challenged the election in a December, 1981 meeting of the Committee, charging that it should be voided for failure to provide proper notice.

In the spring of 1982, the newly constituted City Democratic Committee endorsed four of its members for City Council seats, this being the first time the Democratic Committee had ever endorsed City Council candidates. The Democratic ticket consisted of William P. Williams, party chairman, James F. Gay, counsel for the plaintiffs in this action, Herbert M. Collins, a plaintiff in this lawsuit, and Carolyn Papafil. Gay and Collins are black, while Papafil and Williams are white.

The Concerned Citizens endorsed Rev. Green and Mrs. Butts in the 1982 race, while plaintiff Dr. Milton Reid, publisher of the *Journal and Guide* newspaper, endorsed Collins and Gay. There was animosity between the Concerned Citizens and supporters of the Democratic ticket during the campaign. Rev. Green and Mrs. Butts each received over 87% of the black vote, while Gay and Collins each received less than one-third of the black vote.

In September, 1982, a petition was filed with the Second District Democratic Committee seeking new elections to the City Democratic Committee. An adversary hearing was eventually held before a representative of the State Democratic Party, in which James F. Gay, counsel for the plaintiffs in this action, represented the then current members of the City Committee and Delegate William P. Robinson, Jr., represented the then former Committee members. The hearing officer recommended that new elections be held.

The City Democratic Committee did not hold new elections, despite the hearing officer's recommendation. In 1983, the members of the Committee who had been displaced in 1981 organized a mass meeting of Norfolk's Democrats and elected new Committee members in an at-large election. According to Delegate Robinson, the decision to hold the mass meeting was "purely politics," without any racial connotations. (Tr. 1687).

Included amongst those precinct committee members who lost their positions at the 1983 mass meeting were plaintiffs Herbert M. Collins, Dr. H. Marks S. Richard, Barbara C. Parham and counsel for the plaintiffs, James F. Gay. Subsequently, Mr. Gay filed a complaint with the Department of Justice, complaining about the reorganization of the City Democratic Committee. The Justice Department ultimately concluded that it did not have jurisdiction of the matter under Section 5 of the Voting Rights Act.

3. *Summary*

The Court concludes that blacks have played an active role in the City's political processes, particularly through the Concerned Citizens and the City Democratic Committee. Moreover, at least one black candidate has run in every City Council election since 1964. The Court concurs with the opinions expressed by Mrs. Evelyn T. Butts, Lt. Gov. Henry E. Howell, Jr., Judge Joseph A. Jordan, Jr., Delegate William P. Robinson, Jr., and former Delegate Robert Washington, all leading politicians, that blacks have the opportunity to participate in the City's electoral processes equal-

ly with whites, and have in fact done so. All of these long-time observers of, and participants in, City politics favor retention of the at-large electoral system. The Court gives their opinions great weight.

While the defendants contend that this lawsuit is in reality a case of the "ins" versus the "outs," as a result of past confrontations between the plaintiffs and the Concerned Citizens of Norfolk over endorsements and control of the City Democratic Committee, the Court finds it unnecessary in deciding the issues in this action to enter such a thicket or to make such a finding.

## III. CONCLUSIONS OF LAW

The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1973j(f).

■ Having already set forth the applicable law earlier in this opinion, the Court will now consider the plaintiffs' statutory and constitutional claims.

### A. Statutory Claim Under Section 2 of the Voting Rights Act

1. *The Objective Factors*

   a. *The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.*

■ The law is clear that the existence of past discrimination in the areas of registration, voting and political participation is significant only if it can be shown to have lingering effects on the ability of blacks to participate in the democratic process today. *See Zimmer v. McKeithen,* 485 F.2d at 1305–06; *see also United States v. Marengo County Commission,* 731 F.2d 1546, 1567 (11th Cir.1984). The Court has found that although there is a past history of

official discrimination in Virginia affecting the right of blacks to participate in the electoral process, there are no lingering effects of that discrimination which prevent Norfolk's black citizens from participating in the electoral process today. Norfolk's black citizens register to vote and turn out to vote at rates equal to or greater than that of Norfolk's white citizens when measured as a percentage of voting age population.[8] At least one black candidate has run in every Norfolk City Council election since 1964. Blacks also participate in the political process through the Concerned Citizens of Norfolk and the City Democratic Party. The plaintiffs have failed to prove that the past history of official discrimination in Virginia with regard to black participation in the electoral process has left any lingering effects on the ability of Norfolk's black citizens to participate in the electoral process today.

   b. *The extent to which voting in the elections of the state or political subdivision is racially polarized.*

The Court has adopted the definition of racial polarization offered by the defendants' expert Dr. O'Rourke as one which is supported by common sense, as well as the law. *See, e.g., United States v. Dallas County Commission,* 548 F.Supp. 875, 887 (S.D.Ala.1982) (considering white backlash in addition to voting patterns). The Court has found few courts which have actually considered what is an appropriate definition of "racially polarized voting." Courts have, however, looked beyond the statistics offered by the parties, as this Court has done, in determining whether an electorate is racially polarized. *See, e.g., Terrazas v. Clements,* 581 F.Supp. 1329, 1353 (N.D. Tex.1984) (considering financing, endorsements, and incumbency). The Court concludes that under the definition of racially polarized voting which it has adopted, the Norfolk electorate is not racially polarized.

---

**8.** Contrast this to the findings of the three judge court in *Gingles v. Edmisten,* 590 F.Supp. 345 (E.D.N.C.1984). In that case, the court found a substantial disparity of 14% between black and white voter registration rates, with whites registering at the greater rate. At 360.

c. *The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single-shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.*

(i.) *Unusually Large Election Districts*

Unusually large election districts are considered to have discriminatory effects because they may make it "more difficult for blacks to get to polling places or to campaign for office." *Rogers v. Lodge,* 458 U.S. 613, 627, 102 S.Ct. 3272, 3281, 73 L.Ed.2d 1012 (1982). In that case, the Supreme Court was considering an election district consisting of Burke County, Georgia, which was 831 square miles, the equivalent of two-thirds of the State of Rhode Island. *Id.* In comparison, Norfolk is only fifty-three square miles. The Court has found that Norfolk is not an unusually large election district and therefore this so-called enhancing factor does not apply.

(ii.) *Majority Vote Requirements, Anti-Single-Shot Provisions or Numbered Post Provisions*

A majority vote requirement may impede the ability of black candidates to win in a city in which they constitute a minority of the population. *See Gingles v. Edmisten,* at 363. There is no majority vote requirement in Norfolk's electoral system.

An anti-single-shot provision may disadvantage minority voters because it "may force them to vote for nonminority candidates." *Nevett v. Sides,* 571 F.2d 209, 217 n. 10 (5th Cir.1978), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980). There is no anti-single-shot rule governing Norfolk City Council elections.

A numbered post provision may disadvantage minority voters "by causing minority candidates to run in head-to-head contests against majority candidates." *Id.* There is no numbered post provision in Norfolk's electoral system.

(iii.) *Staggered Terms*

Staggered terms are considered to be a discriminatory device because they are thought to create more head-to-head racial contests. *See City of Rome v. United States,* 446 U.S. 156, 185 n. 21, 100 S.Ct. 1548, 1565 n. 21, 64 L.Ed.2d 119 (1980); *Jones v. City of Lubbock,* 727 F.2d 364, 383 (5th Cir.1984). The Court has found, however, that this does not occur in Norfolk City Council elections because of the large field of candidates in every election.

(iv.) *Lack of a District Residency Requirement*

The courts are divided on the issue of whether district residency requirements enhance or weaken black voting strength. *Compare Rogers v. Lodge,* 458 U.S. at 627, 102 S.Ct. at 3281 (lack of district residency requirement enhances discrimination) *with Perkins v. City of West Helena,* 675 F.2d 201, 212 (8th Cir.1982) (ward residency requirement enhances discrimination), *aff'd,* 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982). The lack of a ward residency requirement has not been shown by the evidence to enhance the opportunity for discrimination in Norfolk City Council elections.

(v.) *Summary*

The Court concludes that Norfolk's electoral system is free of any devices which enhance the opportunity for discrimination against the City's black citizens.

d. *If there is a candidate slating process, whether the members of the minority group have been denied access to that process.*

*White v. Regester,* 412 U.S. 755, 766–67, 93 S.Ct. 2332, 2339–40, 37 L.Ed.2d 314 (1973), and its progeny clarify what is meant by this factor. *See, e.g., McIntosh County Branch of the NAACP v. City of Darien,* 605 F.2d 753, 758 (5th Cir.1979). What the courts are concerned about is whether a small group of whites, acting as a formal or informal slating organization,

effectively limits the ability of blacks to seek electoral office by excluding black candidates from its slating process. *See id.* The courts have considered to be relevant evidence that potential black candidates have been deterred from seeking electoral office because of fears of economic or other forms of reprisals from the members of the white slating group. *See id.*

The Court has found that there is no group of white Norfolk citizens who, acting as a formal or informal slating organization, controls access to the ballot. Moreover, the plaintiffs presented no evidence that any potential black candidate had ever been dissuaded from seeking election by fear of reprisals from any members of the white community. The Court has found that the plaintiffs' contention that a white westside businessmen's coalition acted as a slating organization in the 1976 and 1980 elections is not supported by the evidence. The Court has further found that the only possible instance of slating which has occurred in Norfolk City Council elections was the City Democratic Party's support of a biracial ticket of four candidates in the 1982 election. The Court concludes that there is no candidate slating process in Norfolk and therefore Norfolk's black citizens have not been denied access to such a process.

e. *The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.*

Congress explained its interpretation of this factor as follows:

The Courts have recognized that disproportionate educational [,] employment, income level [,] and living conditions arising from past discrimination tend to depress minority political participation.... Where these conditions are shown, *and where the level of black participation is depressed,* plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.

S.Rep. No. 417, 97th Cong., 2nd Sess. 29 n. 114, *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 207 (emphasis added); *see Major v. Treen,* 574 F.Supp. 325, 351 n. 31 (E.D.La.1983). In other words, if the socio-economic statistics show a disparity between black and white residents *and* the level of black political participation is less than that of whites, the plaintiffs need not show a causal nexus between the two conditions. *See United States v. Marengo County Commission,* 731 F.2d at 1569.

In the present case, the Court has found a disparity between Norfolk's black and white citizens based upon the socio-economic statistics in such areas as education, income, and housing conditions. The Court has found, however, that the level of black political participation in Norfolk is equal to or greater than that of the City's white citizens, as measured by voter registration and voter turnout based upon a percentage of the voting age population, two measures which the courts have used to measure minority political participation. *See, e.g., id.* at 1568. The Court concludes that whatever socio-economic disparities exist between Norfolk's black and white residents, they do not hinder the ability of blacks to participate effectively in the City's political process today.

f. *Whether political campaigns have been characterized by overt or subtle racial appeals.*

In considering this factor, the courts have usually looked for a "general pattern of racial appeals in campaigns." *Gingles v. Edmisten,* at 364. In this case, the plaintiffs have alleged that only one campaign, the 1982 City Council election, was marred by racial appeals. They point primarily to the discussion of public school busing by those candidates who favored or opposed a plan by the Norfolk School

Board to reduce the busing of elementary school pupils.

The Court has found that the discussion of busing during the 1982 campaign was not an appeal to racial prejudices. The issue was a matter of legitimate public concern and was raised by both black and white candidates. There was no effort by the plaintiffs to show a history or general pattern of racial appeals in Norfolk City Council elections and the Court concludes that none exists.

g. *The extent to which members of the minority group have been elected to public office in the jurisdiction.*

It is clear, as the Court pointed out earlier in this opinion, that no group has a constitutional right to proportional representation. *See Whitcomb v. Chavis,* 403 U.S. 124, 156–57, 91 S.Ct. 1858, 1875–76, 29 L.Ed.2d 363 (1971); *Terrazas v. Clements,* 581 F.Supp. 1329, 1341 (1984). Congress explained the consideration which should be given to this factor as follows:

> The fact that no members of a minority group have been elected to office over an extended period of time is probative. However, the election of a few minority candidates does not "necessarily foreclose the possibility of dilution of the black vote" in violation of this section. *Zimmer,* 485 F.2d at 1307. If it did, the possibility exists that the majority citizens might evade the section, e.g., by manipulating the election of a "safe" minority candidate. "Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts to circumvent the Constitution ... Instead, we shall continue to require an independent consideration of the record." *Id.*

S.Rep. No. 417, 97th Cong., 2nd Sess. 29 n. 115, *reprinted in* 1982 U.S.Code Cong. & Ad.News 177, 207.

The Court has conducted an independent review of the record, and contrary to the plaintiffs' claims, has found no evidence of an attempt by Norfolk's white citizens to circumvent the Constitution by manipulating the election of a "safe" minority candidate. The Court further found that a black has been elected to the City Council in every election since 1968, and that the Council currently has two black members. In addition to black membership on the Council, white candidates who have been the choice of a majority of the black electorate have been elected to the Council consistently over the years. Moreover, the Court has found that blacks have been elected to the City's delegation to the Virginia House of Delegates and to a City constitutional office in at-large elections. The Court concludes that blacks and candidates of choice of the black community have been elected to public office in Norfolk.

h. *Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.*

While the issue of responsiveness is not a necessary part of the plaintiffs' case, the plaintiffs have chosen to offer such evidence and the defendants have accordingly offered rebuttal evidence. *See* S.Rep. No. 417, 97th Cong., 2nd Sess. 29 n. 116, 1982 U.S.Code Cong. & Ad.News 177, 207. The Fourth Circuit has stated that the concept of "unresponsiveness" contemplates:

> a degree of unresponsiveness to the needs and interests of the black minority so palpable that it compels—or even fairly supports—an inference that the minority's "voting potential" has been so effectively "cancelled out" that its residual "political strength" is presently being disregarded with confident impunity by the city's governing body.

*Washington v. Finlay,* 664 F.2d 913, 923 (4th Cir.1981), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1333 (1982). In that case, the Fourth Circuit upheld the district court's finding that the city had been responsive, stating:

> Support for this ultimate finding was found in employment figures showing

substantial black employment in city jobs, in significant though concededly not proportional black representation in appointive offices and supervisory positions, in the heavy allocation of federal block grant development funds to the black community, and in the substantially equal provision of essential services and improvements to black residential neighborhoods.

*Id.* at 922.

The Court concludes that the plaintiffs raised a number of issues with regard to responsiveness, but that the evidence offered by the defendants rebuts the plaintiffs' allegations of unresponsiveness. The Court has found evidence of substantial black employment in City jobs, significant black representation on appointive boards and commissions, considerable expenditures of federal and local funds in black-occupied areas, and a nondiscriminatory provision of essential City services and capital improvements to black residential neighborhoods.

i. *Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.*

The Court is to consider whether the City's use of the challenged election procedure "markedly departs from past practices or from practices elsewhere in the jurisdiction...." S.Rep. No. 417, 97th Cong., 2nd Sess. 29 n. 117, *reprinted in* 1982 U.S.Code Cong. & Ad.News 207. The Court has found that Norfolk's at-large system for the election of City Council members has been in effect continuously since 1918. The Court has further found that Norfolk's at-large system of electing City Council members is consistent with the practices of an overwhelming majority of Virginia's cities, as well as with the practices nationwide of cities with council-manager forms of government. The Court concludes that the policy underlying the use of the at-large system is not tenuous.

2. *The Totality of the Circumstances*

■ The Court has already established the proper legal standard to be applied in this case with regard to the Section 2 claim, that is, whether, based on the totality of circumstances, the plaintiffs have shown that the political processes leading to the election of the members of the Norfolk City Council are not equally open to participation by the black citizens of Norfolk, in that they have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The Court has considered thoroughly the lengthy testimony and extensive documentary evidence in this case. The Court concludes, based on the totality of circumstances, that the plaintiffs have failed to prove that the political processes leading to the election of the members of the Norfolk City Council are not equally open to participation by the black citizens of Norfolk. The Court is convinced that Norfolk's black citizens have an opportunity equal to that of other members of the electorate to participate in the electoral process and to elect representatives of their choice.

B. *Statutory Claim Under 42 U.S.C. § 1983*

The Court concludes that the plaintiffs have failed to show that any citizen has been deprived of his or her right to vote on account of his or her race as a result of Norfolk's at-large electoral system. The plaintiffs presented no evidence, that, for example, a qualified black citizen was prevented from registering to vote or from actually voting.

C. *Constitutional Claims*

■ The Court has previously set out the appropriate legal standard to be applied in this case with regard to the constitutional claims, that is, whether the plaintiffs have shown that the at-large system was adopted and has been maintained with the intent of discriminating against the black citizens of Norfolk. Discriminatory intent need not be proven by direct evidence, but

 

may be "inferred from the totality of the relevant facts." *Rogers v. Lodge,* 458 U.S. 613, 618, 102 S.Ct. 3272, 3276, 73 L.Ed.2d 1012 (1982) (quoting *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976)). Furthermore, racial discrimination "need only be one purpose, and not even a primary purpose, of an official act in order for a violation of the fourteenth and fifteenth amendments to occur." *Velasquez v. City of Abilene,* 725 F.2d 1017, 1022 (5th Cir.1984); *see Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

The plaintiffs presented no direct evidence that the at-large system was adopted for a discriminatory purpose. The plaintiffs urge the Court to infer from a series of newspaper articles and advertisements which appeared just days before the referendum on the charter change in 1917 that the proponents of the at-large system had racially discriminatory motives. The Court finds exactly the opposite to be true. It was the opponents of the at-large system who injected the issue of race into the public debate over the charter change just days before the referendum. Supporters of the at-large system contended that race was not an issue and that the opponents of the charter change were trying to sway voters by injecting an irrelevant issue into the public debate. The Court concludes that the plaintiffs have failed to prove, either by direct or circumstantial evidence, that the at-large system was adopted for a racially discriminatory purpose. Likewise, the Court concludes that the at-large system has not been maintained for the purpose of discriminating against Norfolk's black citizens. In reaching these conclusions, the Court has considered all of the evidence submitted by the plaintiffs in support of their Section 2 claim.

## IV. CONCLUSION

On the basis of the foregoing findings of fact and conclusions of law, the Court holds that Norfolk's at-large system for the election of City Council members does not violate Section 2 of the Voting Rights Act, 42 U.S.C. § 1983, or the United States Constitution. Accordingly, the Clerk is DIRECTED to enter judgment in favor of the defendants, and against the plaintiffs, on all claims.

IT IS SO ORDERED.