768 F.2d 572
 Herbert M. COLLINS; Dr. H. Marks S. Richard; Barbara C.
Parham; William E. Swindell, Jr.; Dr. Milton A. Reid;
Norfolk Branch, National Association for the Advancement of
Colored People; George Banks; and Julian Hazel, Appellants,
v.
CITY OF NORFOLK, VIRGINIA, a municipal corporation; Vincent
J. Thomas, Mayor; Dr. Mason C. Andrews; Joseph A. Leafe;
Rev. Joseph N. Green, Jr.; Claude J. Staylor, Jr.; Robert
E. Summers; and Mrs. Elizabeth M. Howell, members of the
Norfolk City Council; City of Norfolk Electoral Board;
Paul D. Fraim, Martha H. Boone, and Paul M. Lipkin, members
of the City of Norfolk Electoral Board, Appellees.
 No. 84-1819.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 1, 1985.
Decided July 22, 1985.
 
 Frank R. Parker, Washington, D.C. (William L. Robinson, Washington, D.C., Patricia M. Hanrahan; James F. Gay, on brief) for appellants.
 R. Harvey Chappell, Jr., Richmond, Va. (Paul W. Jacobs, II, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., Philip R. Trapani, Harold P. Juren, Lydia C. Taylor, Norfolk, Va., on brief) for appellees.
 Before MURNAGHAN and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 MURNAGHAN, Circuit Judge.
 
 
 1
 Maintenance by the City of Norfolk, Virginia, of an at-large election procedure covering members of the City Council has led to a suit by the National Association for the Advancement of Colored People and seven black Norfolk voters contending that Section 2 of the Voting Rights Act, 42 U.S.C. Sec. 1973[1] had been violated. The suit also claimed infringement of the Fourteenth and Fifteenth Amendments through adoption in 1918 of the at-large election as a means to promote racially discriminatory objectives.
 
 
 2
 The relief sought was replacement with a plan establishing seven single member districts, each with one representative in the City Council, together with a declaration of the illegality of and an injunction prohibiting the at-large system due to an unlawful dilution of black voting strength.
 
 
 3
 A bench trial lasting ten days and producing over 2100 pages of transcript and more than 590 exhibits resulted in a judgment in favor of the City of Norfolk and its officials joined as defendants, 605 F.Supp. 377. The issues raised, though sporting various guises, were essentially factual and, in the end, amounted to the assertion that the district judge, in his findings, was clearly erroneous. Manifestly, a heavy burden has been assumed on appeal by the parties who were unsuccessful in the district court. Anderson v. City of Bessemer, North Carolina, --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).[2] Accordingly, we must examine the factual record "in light of the appropriately deferential standard" afforded the district court's findings. Id. at ----, 105 S.Ct. at 1514.
 
 
 4
 Historically, in 1918, provision was made for a five-member City Council, each to be elected at-large. Each was to have a term of four years, with terms to be staggered, presumably to minimize the possible ill-effects of a 100% turnover, all at the same time. Between 1949 and 1952, the number of councilmen rose to seven. In 1968 a nine-member Advisory Study Commission, one of whose members was black, was created by the City Council to study and evaluate the 1918 Charter. Its report and recommendations appeared in 1971. It unanimously recommended retention of staggered terms and at-large elections, agreeing that "councilmen should be elected by and be responsive to the entire community rather than a portion of it." The Commission also expressed a wish to avoid parochialism, which is another way of saying the same thing.
 
 
 5
 Since 1968, one member of the City Council has been black, Joseph A. Jordan, Jr. from 1968 to 1977, and Joseph Green from 1977 to the present. Jordan was vice mayor during his terms beginning in 1972 and 1976. Green has been vice mayor since 1982. In 1984, John Foster, another black, was elected to the City Council.[3]
 
 
 6
 Plurality voting governs in Norfolk. Single-shot voting is not prohibited, i.e., casting votes for a full slate is not required.[4] The Norfolk rules impose no numbered place or residency requirements.[5] Since the passage of the Voting Rights Act in 1965, the black voter registration rate and turnout rate, based on a percentage of the black voting age population, have increased to the point that today they exceed those of Norfolk's white population. White registration is 51.2% of the white voting age population as against 52.9% for the black voting age population. Those figures developed by regression analysis are comparable to 53.1% white and 55.3% black on the homogeneous precinct analysis. Black voter turnout exceeded white voter turnout in the 1984 election. The black turnout rate was 11% higher.[6]
 
 
 7
 Norfolk's efforts to increase voter registration have been exemplary. In the 1984 election, six staff positions were equally divided, three and three in the main registration office. Of the 371 election officers, 102 were black.
 
 
 8
 The Concerned Citizens of Norfolk, a black political organization, endorses both black and white candidates and wields considerable clout. From 1972 through 1984, it had endorsed twenty-one candidates for the City Council. Thirteen (62%) have been elected, of whom five were black and eight white.
 
 
 9
 The municipal work force was 36.16% black in 1973, 41.31% black in 1983. Representation on major boards and commissions appointed by the City Council has been reasonably good. The parties stipulated that programs and services of the fire department, the library department and the Department of Human Resources did not discriminate against blacks and have been responsive to their needs.
 
 
 10
 There are other statistics which generally show improvement in the status and circumstances of blacks in Norfolk. The median income disparity ($17,548 for whites, $10,250 for blacks), an endemic problem for the entire United States, has not been demonstrated to be related in any way to the procedures for election to the Norfolk City Council.
 
 
 11
 In amending in 1982 the Voting Rights Act, Congress called for consideration, in probing the totality of the circumstances, of the following factors:
 
 
 12
 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
 
 
 13
 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
 
 
 14
 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
 
 
 15
 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
 
 
 16
 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
 
 
 17
 6. whether political campaigns have been characterized by overt or subtle racial appeals;
 
 
 18
 7. the extent to which members of the minority group have been elected to public office in the jurisdiction;
 
 
 19
 [8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
 
 
 20
 [9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.
 
 
 21
 S.Rep. No. 417, 97th Cong., 2d Sess. 28-29, reprinted in 1982 U.S.Code Cong. & Ad.News 177, 206-207. Those factors, while generally the most probative, are not exclusive. Congress, through the Senate Committee on the Judiciary, has made clear that at-large elections need not be eliminated. Id. p. 211. The test established by the 1982 amendments merely codified pre-existing law. See, e.g., White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir.1973) (en banc ), aff'd sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).
 
 
 22
 Looking at the facts, as established by the record as a whole, and measuring the question presented by "the totality of the circumstances," we simply are not left with a firm conviction that an error has been committed by the district judge. See United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Perhaps, in such detailed and lengthy findings as the district judge made here it is inevitable that a phrase sprinkled here or there might occasion regret,[7] but the question is not whether we could have done better--a matter necessarily of some uncertainty--but whether the district judge to whom the resolution of factual disputes is finally allocated was clearly erroneous. We cannot say that he was. Accordingly, we affirm.
 
 
 23
 AFFIRMED.
 
 
 24
 BUTZNER, Senior Circuit Judge, dissenting.
 
 
 25
 The principal issues the appellants raise address errors of law to which the clearly erroneous rule does not apply. Pullman Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). Because these assignments of error are meritorious, I would vacate the judgment of the district court and remand the case for consideration of the evidence in accordance with correct legal standards.
 
 
 26
 The appellants complain that the district judge denied them a fair trial because of his expressed antipathy to the conversion of an at-large electoral system to a ward system in which some wards would have a predominately black population. In support of their complaint, the appellants emphasize the following comments of the district court during the proceedings:
 
 
 27
 Well, aren't you when you're asking for a ward system which will guarantee more blacks on [council], that is a quota system, isn't it?
 
 
 28
 * * *
 
 
 29
 * * *
 
 
 30
 That's the problem I have philosophically and I may be premature in raising it.
 
 
 31
 * * *
 
 
 32
 * * *
 
 
 33
 Well, the real question is whether segregated voting ought to be the rule of the day or integrated voting.
 
 
 34
 * * *
 
 
 35
 * * *
 
 
 36
 If you had a 100 percent black ward, there won't be any white candidates there for blacks to vote for, would there?
 
 
 37
 See, what concerns me is you are espousing segregated voting, and that really concerns me as a matter of principle.
 
 
 38
 We're trying to integrate housing, we're trying to integrate schools, we're trying to integrate jobs, we're trying to integrate society so it will work together, and your position is, as a very basic thing, which goes to how we live and how we get along together, and that is the right of franchise, you want to segregate. And that does concern me.
 
 
 39
 * * *
 
 
 40
 * * *
 
 
 41
 So your design, I take it, then is to see that the blacks get a certain quota of people on city council?
 
 
 42
 * * *
 
 
 43
 * * *
 
 
 44
 When you segregate them aren't you creating more problems than you're doing good?
 
 
 45
 * * *
 
 
 46
 * * *They have voted for successful candidates, both black and white, and isn't that better in an integrated society than putting somebody in a color stockade and say this is the way you're going to do?
 
 
 47
 * * *
 
 
 48
 * * *
 
 
 49
 How is the establishment of a ward system going to correct [racial appeals]? How are you going to bring about a millenium of peace on earth and good will toward men by segregating the white vote and the black vote by establishing a ward system?
 
 
 50
 The court's characterization of the relief the appellants are seeking pervaded its perception of the entire proceedings. Thus, in the introduction to its opinion, the court wrote in discussing the "Applicable Law":
 
 
 51
 Two competing legal principles are applicable in this case. The first is that political systems or practices which deny minority voters access to the political system have been repeatedly struck down by the courts.... The second is that courts have consistently rejected the view that any group has a constitutional right to proportional political representation.... These competing legal principles are directly involved in this case. (citations omitted)
 
 
 52
 The appellees respond that the district court was not biased and it did not deny the appellants a fair trial. On the contrary, they say, the concerns raised by the court
 
 
 53
 were solely in the context of (1) whether a ward system in Norfolk would, in order to establish appellants' goals, require a quota system contrary to the express provisions of the Voting Rights Act and (2) whether wards in Norfolk would, as a practical matter, end cross-over racial voting patterns and coalition politics which presumably otherwise are to be encouraged.
 
 
 54
 I do not subscribe to the appellants' complaint of bias. The court's error was not due to prejudice. The error was the court's incorrect interpretation of the proviso found in section 2 of the Voting Rights Act, which states: "Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. Sec. 1973. Both the appellees and the district court incorrectly have equated "proportional political representation" with the institution of a ward system in which some wards will have a majority of black voters.
 
 
 55
 Given the court's misperception of the proviso, judgment against the appellants was foreordained. It is wrong to remedy an illegal at-large system by substituting a proportional representation system; but it is not wrong to substitute a fairly drawn ward system even though some wards will have a majority of black voters. On more than one occasion the Supreme Court has approved conversion of a discriminatory at-large system to a ward system. The ward system must be fairly drawn, but if this condition is met, it is no impediment that some wards have predominately black residents and others have predominately white residents. For example, in City of Richmond v. United States, 422 U.S. 358, 372, 95 S.Ct. 2296, 2304, 45 L.Ed.2d 245 (1975), the Court approved the replacement of an at-large electoral system for the city council with a ward system of four wards with a 64% black majority, four wards with a heavily white electorate, and one ward with a 40.9% black population. More recently, approving the conversion of an at-large system to a ward system in Rogers v. Lodge, 458 U.S. 613, 616, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982), the Court observed that a minority may be unable to elect representatives in an at-large system, but it may be able to elect several representatives if single-member districts are established.
 
 
 56
 The appellants do not seek proportional representation. Instead, they seek conversion of an at-large system to a ward system. Nevertheless, in its discussion of "Applicable Law," the court confused an impermissible "proportional political representation plan" with a permissible ward plan. The court's perception that the relief the appellants sought competed with the rights secured by section 2 of the Voting Rights Act was a mistake of law that infected this entire proceeding. Indeed, the concerns the district court expressed during the trial about the remedy the appellants seek were similar to the views rejected by the Congress when it enacted the 1982 amendments to the Voting Rights Act. See Gingles v. Edmisten, 590 F.Supp. 345, 356-57 (E.D.N.C.1984) (three-judge court), prob. juris. noted, Thornburg v. Gingles, --- U.S. ----, 105 S.Ct. 2137, 85 L.Ed.2d 495 (1985).
 
 
 57
 Although the appellants contend that some of the district court's findings are clearly erroneous when tested by the precepts of United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), the primary thesis of their appeal is the commission of errors of law. They assert that the district court erred in applying the criteria prescribed by S.Rep. No. 417, 97th Cong., 2d Sess. 28-29, reprinted in 1982 U.S.Code Cong. & Ad.News 177, 206-207 (hereinafter cited as Senate Report). These criteria were derived from case law and should be interpreted in the light of that law.
 
 
 58
 One of the most important factors Congress directed courts to consider is the extent to which voting is racially polarized. The district court adopted a definition of polarization that required the appellants to prove "white backlash" and that "whites attempt to limit the field of candidates." In support of this definition, it cited a single case, United States v. Dallas County Commission, 548 F.Supp. 875, 904-05 (S.D.Ala.1982). This case, however, has been reversed by a decision that recognized the existence of racial polarization without requiring proof of either additional element. See United States v. Dallas County Commission, 739 F.2d 1529, 1535-36 (11th Cir.1984).
 
 
 59
 The definition of polarization the district court applied is contrary to precedent. The Supreme Court has recognized that racially polarized voting exists when there is "bloc voting along racial lines." Rogers v. Lodge, 458 U.S. 613, 623, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 1012 (1982). See United Jewish Organizations v. Carey, 430 U.S. 144, 166, 97 S.Ct. 996, 1010, 51 L.Ed.2d 229 (1977) (voting following racial lines). See also NAACP v. Gadsden County School Board, 691 F.2d 978, 982 (11th Cir.1982); City of Rome v. United States, 472 F.Supp. 221, 226 (D.D.C.1979) (three-judge court), aff'd, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980).
 
 
 60
 The additional elements the district court engrafted on the accepted definition of racially polarized voting require proof of intention to abridge the minority's voting rights. This is evident from the Court's insistence that minority complainants prove that "whites attempt to limit the field of candidates." But in enacting the 1982 amendments to the Voting Rights Act, Congress eliminated the necessity of proving a discriminatory purpose to establish a violation of the Act. See Senate Report at 27, 1982 U.S.Code Cong. & Ad.News 205. The district court's interpretation is contrary to the cardinal principle of the 1982 amendment.
 
 
 61
 Another factor deemed important by the Senate Judiciary Committee is a slating process to which the minority has been denied access. To determine whether this factor exists, the district court adopted, without the citation of precedent, a restrictive definition of a "slate." The court required the appellants to prove a "permanent or semipermanent organization" which solicits candidates to run for office and puts them up "for as many seats as are open." The legislative history offers no support for this definition. It is contrary to the accepted meaning of "slate," which Webster's Third International Dictionary defines as simply "the group of persons proposed for appointment, nomination, or election." Significantly, courts that have discussed slates or a slating process have not imposed the burdensome requirements initiated by the district court. See White v. Regester, 412 U.S. 755, 766-67, 93 S.Ct. 2332, 2339-40, 37 L.Ed.2d 314 (1973); McIntosh County NAACP v. Darien, 605 F.2d 753, 758 (5th Cir.1979).
 
 
 62
 The responsiveness of elected officials to the particularized needs of the members of the minority group is another factor mentioned in the Senate Report. In its inquiry about this subject, the district court required the appellants to prove that the relocation of approximately 1800 black families whose neighborhood was redeveloped for middle-income families was racially motivated. This was an error of law. It bears repeating that minority citizens are not required to prove a discriminatory purpose to establish their rights under section 2 of the Voting Rights Act. Faulty interpretation of the Act is not avoided by requiring proof of "racial motivation," for this term is simply a semantic disguise for "discriminatory purpose."
 
 
 63
 Contrary to Supreme Court precedent, the district court held that staggered terms and the lack of residency requirements do not enhance the opportunity for discrimination against minorities. See City of Rome v. United States, 446 U.S. 156, 185, 100 S.Ct. 1548, 1565, 64 L.Ed.2d 119 (1980) (staggered terms); Rogers v. Lodge, 458 U.S. 613, 627, 102 S.Ct. 3272, 3280, 73 L.Ed.2d 1012 (1982) (lack of residency requirements). See also Jones v. Lubbock, 727 F.2d 364, 383 (1984) (staggered terms are evidence of violation of Section 2 of the Voting Rights Act). Additionally, staggered terms of office are cited as examples of objective factors of discrimination in both House and Senate reports. H.R.Rep. No. 227, 97th Cong., 1st Sess. 18 (1981); Senate Report at 143-44, 1982 U.S.Code Cong. & Ad.News 315-16.
 
 
 64
 It is not the function of this dissent to reassess the evidence in light of the correct principles of law. This can be undertaken by the district court on remand. It is enough to note that the district court's judgment is fatally flawed by its erroneous interpretation of statutory and case law and that application of proper legal standards to the evidence could alter the outcome of this litigation.
 
 
 65
 Nevertheless, a fact the district court omitted in its opinion deserves comment. The keystone of the appellees' defense was the election of a second black councilman in 1984 after this action was commenced. The appellants challenge the significance of this event. They point out that despite a long history of discrimination by city officials, the mayor for the first time supported a second black candidate for council. The appellants emphasize that the mayor publicly stated how the election of the candidate would affect this litigation in which the mayor was a defendant.
 
 
 66
 Testifying under cross-examination, the mayor admitted that he was quoted correctly in a newspaper article before the election:
 
 
 67
 [Plaintiffs' attorney]: Now, the next to the last paragraph of that article, "The election of a second black Council member could influence the outcome of an NAACP suit seeking a ward system in Norfolk. The suit contends current at-large elections have prevented blacks from getting fair representation on Council and seeks to establish a ward system. The case is scheduled to be [heard] May 17 in the U.S. District Court.
 
 
 68
 And then you're quoted here, Mayor, " 'After the election, the issue of black representation may become a moot point,' Thomas said."
 
 
 69
 Do you agree with that?
 
 
 70
 [Mayor]: Yeah, I said that. That's merely an observation. That has nothing to do with my motivation for supporting a black for City Council.
 
 
 71
 Regardless of his intentions about supporting a black candidate for an unprecedented second seat, the mayor seized on the opportunity of that candidacy to let his constituents know that a favorable vote for the black candidate could moot the issue of black representation, a development, of course, which he favored.
 
 
 72
 The mayor's published statement was a subtle racial appeal, of the type which the Senate report condemns, for implicitly it appealed to all who opposed the ward system, which was sought by the NAACP, to vote for the mayor's black candidate. The district court did not discuss this episode. Instead, it brushed aside the challenge to the appellees' defense as "innuendo." Without mention of the mayor's public statement about mooting the issue of black representation, the district court found: "There is no evidence that the election of Rev. Foster was orchestrated by white city officials or community leaders in an attempt to moot this action."
 
 
 73
 Whatever the mayor did or did not do to "orchestrate" the black candidacy for a second seat, he certainly promoted it for an improper purpose. The mayor's tactic is not new. It has long been suspect. In a case from which the Senate Judiciary Committee derived the factors it prescribed, Zimmer v. McKeithen, 485 F.2d 1297, 1307 (5th Cir.1973), aff'd sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), the court said:
 
 
 74
 [W]e cannot endorse the view that the success of black candidates at the polls necessarily forecloses the possibility of dilution of the black vote.... [S]uch success might be attributable to political support motivated by different considerations--namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds.
 
 
 75
 Because the evidence discloses that the mayor publicly represented that election of the black candidate, whom he supported, might moot the issue that is at the heart of this action, I cannot accept the notion that the district court's finding was not clearly erroneous.
 
 
 76
 I respectfully dissent.
 
 
 
 [1]
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 1973b(f)(2) as provided in subsection (b) of this section
 (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 (Emphasis added).
 
 
 [2]
 If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous
 --- U.S. at ----, 105 S.Ct. at 1512.
 
 
 [3]
 A point pressed by the appellants was the asserted existence of a conspiracy to orchestrate Foster's election through the decision, after the institution of this suit, of a white candidate to abandon efforts to obtain reelection. Such interference with the election process would no doubt have been of immense significance to the ultimate outcome of the case, if proven. However, it was obliterated by the district judge's findings, which were not clearly erroneous, that the white candidate's withdrawal was for personal reasons and that his support for election of a second black antedated the filing of the suit. The district judge went on to find that "[t]here is no evidence that the election of Rev. Foster was orchestrated by white city officials or community leaders in an attempt to moot this action."
 The dissent contends that it was clearly erroneous for the district court to conclude that city officials did not attempt to moot the instant lawsuit. To support its contention, the dissent highlights a newspaper article in which the Mayor of Norfolk was quoted as saying, "After the election, the issue of black representation may become a moot point." Whether that published statement which, on its face, amounts to no more than the expression of an opinion by no means necessarily inaccurate, constituted a subtle and improper racial appeal pivoted largely on the credibility of the Mayor's defense of that statement as well as a close factual examination of the general political mood in Norfolk at the time of the City Council election. Thus, we in the panel majority are hardpressed to upset the district judge's conclusion that Foster's election was not promoted for an improper purpose. See Anderson v. City of Bessemer, supra, at ----, 105 S.Ct. at 1512.
 
 
 [4]
 Although staggered terms can have the effect of frustrating single-shot voting, the district court found that the City of Norfolk adduced sufficient evidence at trial to prove that the staggered terms of the City Council members did not promote "head to head contests between [Blacks] and whites and [did not] deprive [Blacks] of the opportunity to elect a candidate by single-shot voting." City of Rome v. United States, 446 U.S. 156, 185, 100 S.Ct. 1548, 1566, 64 L.Ed.2d 119 (1980). The district court noted that, if staggered terms were to have a discriminatory effect upon Norfolk's City Council elections, it would be likely that the elections for the fewest number of seats would not yield any black candidates. Yet the evidence demonstrated that in those elections in which the fewest number of seats--i.e., three--were open for election, a black had always been victorious. In light of such evidence, the district court's findings with respect to staggered terms cannot be deemed clearly erroneous
 
 
 [5]
 There is disagreement over whether residency requirements minimize the voting strength of racial minorities. See Rogers v. Lodge, 458 U.S. 613, 627, 102 S.Ct. 3272, 3280, 73 L.Ed.2d 1012 (1982) (Without residency requirement all residents could reside in " 'lily-white' neighborhoods"). Compare Perkins v. City of West Helena, 675 F.2d 201, 212 (8th Cir.1982), aff'd, 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982) (Ward residency requirement, inter alia, effectively prohibited single-shot voting and "enhance[d] the possibility that [City's] election scheme [was] being maintained for a discriminatory purpose"). The lesson to be derived is that any particular aspect of the voting process need not be absolutely good or bad. Rather the application in the particular case should control, and we should eschew generalities. Determining whether residency requirements, or the lack thereof, hinder the position of racial minorities within the electoral process requires a careful factual and statistical analysis of the specific political community under scrutiny
 In the instant case, the district court, after considering all of the evidence, concluded that the lack of a ward residency requirement did not enhance the opportunity for discrimination in elections for Norfolk City Council members. That conclusion was amply supported by the record. For example, the record demonstrated that the lack of a residency requirement did not water down the ability of black voters successfully to utilize single-shot voting nor did it result in "lily-white" representation.
 
 
 [6]
 Those statistics came from studies introduced in evidence by the appellants. They did not cover the predominantly white residents of naval bases and ships. Had they been included, the statistics would have been even more striking as to black predominance
 
 
 [7]
 For example, the dissent contends that the district court, evidenced by his remarks throughout trial, "equated 'proportional political representation' with the institution of a ward system in which some wards will have a majority of black voters." However, the district judge's remarks must be read in the context of a rather long and difficult trial in which he was attempting to comply with the proviso in Sec. 2 of the Voting Rights Act ("Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). Thus, the district court, in contrast to the dissent's assertion, did not conclude, as a matter of law, that ward systems would be violations of that proviso but rather merely attempted to grapple with the interplay between the appellants' desired relief and a statutory prohibition